1

2

3

4                        UNITED STATES DISTRICT COURT

5                            DISTRICT OF NEVADA

6                                    * * *
                                      )
7    PATRICK GEORGE,                   )
                                      )
8              Plaintiff,              )
                                      )
9    v.                                )        2:06-CV-1112-PMP-GWF
                                      )
10   PETER A. MORTON, et. al.,         )        O R D E R
                                      )
11             Defendants.            )
     _____ )

12

13             Presently before the Court is Defendants Eric Metzger and Chad Ackerley's

14   Motion to Dismiss Plaintiff's Complaint and Supporting Memorandum of Law (Doc. #35),

15   filed on November 16, 2006.  On December 4, 2006, Plaintiff Patrick George filed an

16   Opposition (Doc. #38).  Defendants filed a Reply (Doc. #41) on December 18, 2006.

17   I.        BACKGROUND

18             In 2004, Defendant Peter A. Morton ("Morton"), owner of Defendant Hard Rock

19   Hotel, Inc. ("Hard Rock"), announced an expansion project called the "Bungalow Flats

20   Residences at the Hard Rock Hotel & Casino," which would feature approximately 1,350

21   condominiums, along with various other resort facilities and amenities ("the Project").

22   (First Am. Comp. [Doc. #3] at 3.)  Defendant PM Realty, LLC ("PM Realty"), which

23   Morton manages, acquired the property on which the Project was to be built.  (Id.)

24   According to the Amended Complaint, Defendant HR Condominium Investors (Vegas)

25   LLC ("HRCI") was to own the Project.  (Id.)  HRCI's managers are PM Realty; Defendant

26   IDM Investments 1, LP ("IDM 1"); and Defendant IDM Investments 2, LP ("IDM 2").

(Id.)  Defendant Christopher Milam ("Milam") manages IDM 1 and IDM 2.  (Id.)

In February 2005, HRCI entered into an agreement with PM Realty to acquire the Project property for approximately $86,000,000 dollars.  (Id.)  HRCI also contracted with Defendant IDM Properties, LP ("IDM Properties"), which Milam manages, to be a consultant for the Project.  (Id. at 4.)  At approximately the same time, HRCI contracted with IDM Properties (Nevada), LLC ("IDM Nevada"), granting IDM Nevada the exclusive right to market and sell the Project's condominiums ("Sales and Marketing Agreement").  (Id.)  Milam also manages IDM Nevada.  (Id.)  IDM Nevada subsequently assigned its interest in the Sales and Marketing Agreement to Defendant HRSM.  (Id.)  Defendants Eric Metzger ("Metzger"), Chad Ackerley ("Ackerley"), and Milam are HRSM's officers.

According to the Amended Complaint, in February 2005, Plaintiff entered into a commission contract with HRSM to be a salesperson for the Project.  (Id.)  Plaintiff alleges the terms of the contract were as follows:

A.  Plaintiff would be employed as a salesperson for HRSM from March 1, 2005 through October 1, 2005, with six-month renewable option periods upon which both parties had to mutually agree.  (Id.)

B.  HRSM would pay Plaintiff 40% of his commissions after funding of the construction loan and 60% upon actual closing upon move in.  (Id.)

C.  Plaintiff would receive a $4,000 per month draw against future commissions until Plaintiff received his fist commissions out of the construction loan.  (Id.)

D.  Plaintiff's commission for "condotel" and luxury residences would be approximately 0.5% for 1-35 units sold; 0.75% for 36-70 units sold; 1.0% for 71-105 units sold; and 1.25% for 106-140 units sold.  (Id.)

E.  HRSM would pay bungalow commissions out of a pool with Plaintiff's percentage of the pool being based upon Plaintiff's percentage of contribution to the

1  condotel and luxury units sold.  (Id.)

2        F.  The bungalows' commission scale provided for 1.0% payment of the total

3  sale.  (Id.)

4        G.  The bungalow commissions were to be paid according to the following

5  schedule relating to performance in selling condotel and luxury units: approximately 25% of

6  earned commissions for 1-35 units sold; 50% of earned commissions for 36-70 units sold;

7  75% of earned commissions for 71-105 units sold; and 100% of earned commissions for

8  106-140 units sold.  (Id. at 4-5.)

9        H.  HRSM agreed to pay for one round trip per month between Las Vegas and

10  New York.  (Id. at 5.)

11        I.  HRSM agreed to reimburse Plaintiff for all reasonable sales related expenses.

12  (Id.)

13        J.  Each sales person only would be permitted to take reservations from clients

14  without brokers and HRSM salespersons would not engage in internal competition sales.

15  (Id.)

16        K.  Plaintiff would receive a 1.25% commission override on all properties Duke

17  Real Estate Group sold.  (Id.)

18        In March 2005, HRSM started marketing and selling the Project.  (Id.)

19  Defendants made numerous representations to Plaintiff promoting the quality and value of

20  the Project.  (Id.)  On multiple occasions, Plaintiff asked Metzger and Ackerley about the

21  Project's specifics, including the size of the units, the total number of units, and pricing

22  information.  (Id.)  Defendants allegedly informed Plaintiff no unit-specific paperwork

23  existed regarding the Project and Plaintiff had to promote the Project's "magic and

24  mystery" to potential buyers.  (Id.)

25        In mid-March 2005, Ackerley, Metzger, and Milam introduced Ray Ware

26  ("Ware") as HRSM and HRCI's designated broker and stated they were not offering outside

brokers reservations for their clients.  (Id.)  Instead, Ware would work with outside brokers and would refer those brokers' potential clients to Plaintiff and HRSM's other sales people. (Id.)   Around this same time, Metzger announced that Duke Realty Group would be the only broker permitted to make Project sales and Plaintiff would receive a 1.25% commission override on such sales as a bonus.  (Id. at 5-6.)  At the end of March 2005, Plaintiff asked Metzger and Ackerley for a complete list of clients to determine the number of reservations that had been taken up to that date and whether the buyers' reservation deposit had been transferred to Nevada Title.  (Id. at 6.)  Metzger and Ackerly allegedly told Plaintiff they were unable to give him a list containing this information.  (Id.)

In April 2005, Plaintiff again asked Metzger and Ackerley for unit-specific information as well as a complete reservation list and information regarding whether the buyers' deposits had been transferred to Nevada Title.  (Id.)  Metzger and Ackerly once again told Plaintiff no unit-specific paper work existed and they were unable to provide a complete reservation list or information concerning buyers' deposits at Nevada Title.  (Id.) Plaintiff also alleges that in April 2005, Metzger and Ackerley encouraged Ware to take broker client reservations and encouraged Plaintiff and other sales people to give all broker client reservations to Ware.  (Id.)  On April 30, 2005, the weekend of the Hard Rock's 10th anniversary event, Morton announced the Project was "sold out."  (Id.)  However, after the announcement, Metzger, Ackerley, and Milam informed Plaintiff they had not completed over 3,600 reservations yet, which meant the Project actually was not sold out.  (Id.)

During a sales meeting on May 3, 2005, Metzger and Ackerley informed Plaintiff that the Project's units would be priced by June 15, 2005 and Plaintiff would receive pricing information before June 1, 2005.  (Id. at 7.)  In mid-May 2005, Metzger told Plaintiff that he and Ackerley were studying to take the Real Estate Sales Person licensing exam because they were dealing with potential buyers on a daily basis.  (Id.)  However, Ackerley later told Plaintiff he did not intend to take the exam to receive his license.  (Id.)  During this same

4

time, Plaintiff's sales assistant allegedly found over forty checks from potential buyers for reservation deposits inside an unlocked desk drawer in the sales office.  (Id.)  According to the Amended Complaint, Ackerley was supposed to deposit the checks but continued to store them in the desk drawer.  (Id.)  Throughout May 2005, Plaintiff continued to request a reservation list and Nevada Title deposit information but was never provided the information.  (Id.)

On June 1, 2005, Metzger and Ackerley gave Plaintiff a reservation list containing client information and whether a client's deposit check was transferred to Nevada Title.  (Id.)  Upon examination of the list, Plaintiff allegedly discovered that numerous reservation deposits were "lost" during transfer and thus never were deposited.  (Id.)  On June 4, 2005, Metzger, Ackerley, and Milam held a sales meeting to discuss the units, pricing, and amenities but upon Plaintiff's request for more specific information, Defendants repeatedly stated "I don't know," "I can't tell you that," or "we'll get back to you on that."  (Id. at 8.)

During June 2005, Metzger and Ackerley informed Plaintiff that the Project broker was not Ware, but instead Mike Gonyea, whom Plaintiff had never heard of or seen, and which change delayed Plaintiff's submission for his real estate license and contributed to the confusion with respect to who the broker was for HRSM.  (Id.)  Around that same time, the sales team put together Unit Specific Packages ("USPs") to send to buyers.  (Id.)  The USPs were supposed to consist of an agreement, pricing guides, and floor plans but numerous USPs were missing various pages, many buyers never received their USPs, and a legal department never reviewed the USPs' accuracy.  (Id.)  In addition, a number of buyers contacted Plaintiff inquiring as to whether their deposit checks had been transferred to Nevada Title because they had never received a confirmation.  (Id.)  Plaintiff allegedly discovered that his clients' reservation deposit checks were never transferred because Ackerley continued to keep the checks in an unlocked desk drawer at the sales office.  (Id.)

1   As a result, these checks were not transferred to Nevada Title in the time-frame required

2   under Nevada law.  (Id.)

3          In July 2005, Plaintiff found out that Ware was offering outside brokers unit

4   reservations for clients, despite Metzger and Ackerley's representations to the contrary.

5   (Id.)  At the end of July 2005, Metzger, Ackerley, and Milam repeatedly represented to

6   Plaintiff that the Project was on track and wanted Plaintiff to tell potential buyers the

7   Project was sold out and for Plaintiff to highlight the importance of "getting in" the Project.

8   (Id. at 8-9.)  Based on Defendants' representations, Plaintiff continued to market and sell

9   Project units.  (Id. at 9.)  During this same time, Plaintiff asked Metzger and Ackerley on

10  multiple occasions for an updated client reservation list to determine whether Nevada Title

11  had ever received the "lost" deposit checks.  (Id.)  Although Metzger and Ackerley told

12  Plaintiff that all checks arrived at Nevada Title, a Nevada Title representative allegedly

13  informed Plaintiff that one check had been cut, which was to be sent to Chicago Title, but

14  the representative was unable to determine where the money was, who had possession of it,

15  and whose checks actually were deposited.  (Id.)

16         In August 2005, after Plaintiff received a list of which buyers were going to be

17  placed in Towers 1, 2, and 3, Plaintiff asked Metzger, Ackerley, and Milam why Towers 4

18  and 5 were not listed and was told that Morton was looking to redesign the tops of these

19  towers to fit more units.  (Id.)  However, when Plaintiff asked one of the architects for the

20  Project whether Morton was redesigning Towers 4 and 5 the architect allegedly told

21  Plaintiff that was not the case.  (Id.)  Throughout August 2005, Metzger, Ackerley, and

22  Milam continued to reassure Plaintiff the Project was on track and represented that no

23  Project had ever been in such demand and that this Project was the largest single residential

24  release in North American history.  (Id.)  Based on these representations, Plaintiff continued

25  to market and sell Project units.  (Id.)

26  ///

1    During August 2005, buyers were being placed in different units than they had

2    previously requested.  (Id.)  HRSM represented that if the buyers wanted to get into the

3    Project they would have to take what was available and continuously stated that the units

4    were "oversubscribed" and that Plaintiff and other sales persons needed to "spin" the

5    situation by telling buyers they needed to be "flexible" due to unprecedented demand for the

6    Project.  (Id. at 9-10.)

7    In September 2005, Metzger, Ackerley, and Milam announced that the tops of

8    Towers 4 and 5 were going to be redesigned with fully furnished "Sky Studios" to

9    accommodate the demand and that the Sky Studios were going to be the "hottest thing."

10    (Id. at 10.)  Based on these representations, Plaintiff continued to market and sell these new

11    units.  (Id.)  Metzger, Ackerley, and Milam continued to pressure Plaintiff to "get people

12    into the Project" and to convince those not in units to buy a Sky Studio.  (Id.)  However,

13    these Defendants told Plaintiff they were unable to give Plaintiff any information regarding

14    the Sky Studios but to emphasize to potential buyers the "just getting in factor."  (Id.)

15    Metzger, Ackerley, and Milam continued to represent to Plaintiff that the Project was

16    progressing as scheduled and assured Plaintiff, and buyers, that they had "secured the

17    largest single phase construction loan in North American history for 1.25 billion by Credit

18    Suisse First Boston."  (Id. at 10-11.)

19    In mid-September 2005, Metzger, Ackerley, and Milam told Plaintiff that

20    construction would be delayed until December 2005, but assured Plaintiff "everything was

21    going forward."  (Id. at 11.)  Based on these representations, Plaintiff continued to market

22    and sell Project units.  (Id.)  According to the Amended Complaint, at the end of September

23    2005, Milam told Plaintiff that Morton had switched interior designers three times, was

24    increasing the Project's construction costs, and the profit margin was decreasing rapidly due

25    to Morton's lack of knowledge and "ego-based decisions."  (Id.)

26    ///

On October 12, 2005, Morton announced "the signing of a loan commitment" for $1.25 billion for construction of the Project with Credit Suisse. (Id.) Around this same time, HRSM sent contracts, signature pages, disclosures, floor plans, and information guides to buyers. (Id.) However, many buyers could not fully execute their contracts because signature pages or disclosure statements were missing. (Id.) When Plaintiff inquired about the incomplete contracts, Metzger, Ackerley, and Milam informed Plaintiff that the developer would execute everything and return it to the buyer, which would serve as the buyer's receipt and confirmation. (Id.) Plaintiff claims this never happened. (Id.) Defendants told Plaintiff to focus his efforts on getting more buyers into the Project instead of completing contracts for current buyers. (Id.)

In November 2005, Metzger, Ackerley, and Milam announced that construction would be delayed until February 2006, but reassured Plaintiff that the Project still was going forward. (Id. at 12.) Defendants advised Plaintiff "to offer clients a fully refundable 10% deposit, regardless of whether or not such clients had executed a contract." (Id.) According to the Amended Complaint, HRSM continued to maintain the Project was "sold out" but actually was holding units under fictitious client names so that representatives from Credit Suisse would see that these units were filled. (Id.)

On December 10, 2005, Milam informed Plaintiff that Morton had eliminated Milam from the Project because Metzger misrepresented to Morton that Milam "was not soliciting money from clients to fund his portion of responsibility for the development, and was instead using the money to fund other personal projects." (Id.) After repeated attempts to contact Metzger to find out whether Milam's statements were true, Metzger contacted Plaintiff and told him Milam "was a crook, and was stealing money from investors." (Id.) Metzger also told Plaintiff that Milam "had facilitated the loan to be released at a 90% absorption rate, even though Metzger had initially told Plaintiff that the actual absorption rate was 70%." (Id.) Consequently, Metzger led Plaintiff to believe he would be paid soon

since he was entitled to receive 40% of his commissions at the release of the construction loan.  (Id.)

In December 2005, Morton acquired control of HRCI, including the marketing and development agreements HRCI had with HRSM, and terminated the marketing agreements.  (Id.)  With Morton in control of HRCI, HRCI released PM Realty, which Morton also manages, from its obligation to sell the Project property to HRCI.  (Id.)  On or about February 21, 2006, Morton closed the Project's marketing office, dismissed the sales staff, and announced he was considering offers from numerous potential buyers to sell the Hard Rock Hotel & Casino as well as the Project and therefore placed the Project on "hold."  (Id. at 13.)  A short time later, Morton announced he had sold the Hard Rock Hotel & Casino, including the Project, and the Project was "cancelled."  (Id.)

According to the Amended Complaint, Plaintiff relied on Defendants' statements and representations and procured about 265 willing and able buyers for units at the Project.  (Id.)  Pursuant to his contract with HRSM, Plaintiff claims he is entitled to a 1.25% commission for each unit he sold at the project, a 1.25% commission override on all properties Duke Real Estate Group sold, a commission out of the bungalow pool, a percentage of Ware's internal sales, and a $4,000 per month draw up until the time the first commissions were supposed to be paid out of the construction loan.  (Id. at 13-14.)  To date, Plaintiff has been paid a few months of draw and some expenses.  (Id. at 14.)  Consequently, Plaintiff brings suit against Defendants claiming breach of contract, breach of the implied covenant of good faith and fair dealing, quantum meruit/unjust enrichment, intentional interference with a contract, conspiracy to interfere with a contract, fraud in the inducement, unfair and deceptive trade practices, that piercing the corporate veil is appropriate, and punitive damages.  (Id. at 14-21.)

///

///

1    Defendants Metzger and Ackerley move to dismiss Plaintiff's Amended

2 Complaint arguing Plaintiff is not allowed to assert a claim for quantum meruit or unjust

3 enrichment as a matter of law, Plaintiff's claim for interference with a contract and

4 conspiracy to interfere with a contract fail because Metzger and Ackerley cannot interfere

5 with a contract to which HRSM is a party, Plaintiff has failed to allege fraud with

6 particularity, no private cause of action exists under the unfair and deceptive trade practices

7 statute, and claims to pierce the corporate veil and for punitive damages are remedies, not

8 independent causes of action.

9    **II.    LEGAL STANDARD**

10    In considering a motion to dismiss, "[a]ll allegations and reasonable inferences

11 are taken as true, and the allegations are construed in the light most favorable to the non-

12 moving party, but conclusory allegations of law and unwarranted inferences are insufficient

13 to defeat a motion to dismiss."  Simpson v. AOL Time Warner, Inc., 452 F.3d 1040, 1046

14 (9th Cir. 2006) (quoting Adams v. Johnson, 355 F.3d 1179, 1183 (9th Cir. 2004)).  There is

15 a strong presumption against dismissing an action for failure to state a claim.  See Gilligan

16 v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997) (citation omitted).  The issue is not

17 whether the plaintiff ultimately will prevail, but whether he may offer evidence in support

18 of his claims.  Id. (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  Consequently,

19 the Court may not grant a motion to dismiss for failure to state a claim "unless it appears

20 beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

21 entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Hicks v.

22 Small, 69 F.3d 967, 969 (9th Cir. 1995).

23    The liberal rules of notice pleading set forth in the Federal Rules of Civil

24 Procedure do not require a plaintiff to set out in detail the facts supporting his claim.  See

25 Yamaguchi v. United States Dep't of the Air Force, 109 F.3d 1475, 1481 (9th Cir. 1997)

26 (quoting Conley, 355 U.S. at 47).  All the Rules require is a "short and plain statement" that

adequately gives the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. at 1481 (citations and internal quotations omitted). A claim is sufficient if it shows that the plaintiff is entitled to any relief which the court can grant, even if the complaint asserts the wrong legal theory or asks for improper relief. See United States v. Howell, 318 F.2d 162, 166 (9th Cir. 1963).

## III.      DISCUSSION

### A.  Quantum Meruit/Unjust Enrichment

Metzger and Ackerley argue that because Plaintiff alleges he was a party to an employment contract with HRSM, Plaintiff cannot make a claim under quantum meruit or unjust enrichment as a matter of law. In response, Plaintiff contends under Federal Rule of Civil Procedure 8(e) a party may plead in the alternative and therefore Plaintiff may state a claim both for breach of contract and unjust enrichment or quantum meruit.

Pursuant to Federal Rule of Civil Procedure 8(e)(2):

> A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.

The liberal policy reflected in Rule 8(e)(2) instructs courts not to construe a pleading "as an admission against another alternative or inconsistent pleading in the same case." McCalden v. Cal. Library Ass'n, 955 F.2d 1214, 1219 (9th Cir. 1990) (quoting Molsbergen v. United States, 757 F.2d 1016, 1019 (9th Cir. 1985)). Thus, although a plaintiff may not recover on both theories, "a plaintiff may claim these remedies as alternatives, leaving the ultimate election for the court." E.H. Boly & Son, Inc. v. Schneider, 525 F.2d 20, 23 n.3 (9th Cir. 1975); see also Hubbard Bus. Plaza v. Lincoln Liberty Life Ins. Co., 596 F. Supp. 344, 347 (D. Nev. 1984) (stating a "claimant is entitled to introduce his evidence in support of all his

claims for relief; if he doesn't make an election among them, the trier of fact decides which, if any, to sustain.").

Metzger and Ackerley seek to dismiss Plaintiff's equitable claim for unjust enrichment/quantum meruit because count one of Plaintiff's Amended Complaint alleges the existence of an employment contract. Under Rule 8(e)(2), however, Plaintiff is entitled to plead in the alternative "as many separate claims or defenses as [Plaintiff] has regardless of consistency and whether based on legal, equitable, or maritime grounds." Nevada's recognition of the rule disallowing recovery of equitable remedies where a plaintiff has a full and adequate remedy at law has no bearing on a plaintiff's right to plead in the alternative and to present evidence in support of all his well-pleaded claims for relief. At this stage of the litigation, the issue is not whether Plaintiff will prevail on his claim, but whether he may conduct discovery and offer evidence in support of his claim. Alleging a valid employment contract exists does not prove its existence. Consequently, if the Court were to conclude no valid employment contract existed, Plaintiff would have available an alternative theory for relief. The Court therefore will deny Defendants' motion to dismiss Plaintiff's unjust enrichment/quantum meruit claim because the Federal Rules of Civil Procedure permit Plaintiff to plead a claim for breach of contract and unjust enrichment/quantum meruit, notwithstanding their inconsistency.

**B. Intentional Interference & Conspiracy to Interfere with a Contract**

Defendants argue this Court should dismiss Plaintiff's claim for interference with a contract and conspiracy to interfere with a contract because Plaintiff failed to allege either Metzger or Ackerley engaged in any specific acts of interference and Metzger and Ackerley, as owners of HRSM, cannot interfere with a contract to which HRSM is a party as a matter of law. In response, Plaintiff contends the Amended Complaint provides numerous examples of interference with his contract. Further, Plaintiff argues despite Metzger and Ackerley's ownership of HRSM, Metzger and Ackerley still may be held

liable for interference with a contract because their acts of interference occurred outside the scope of their employment at HRSM.

To state a claim for intentional interference with contractual relations the Plaintiff must allege: "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." Hilton Hotels Corp. v. Butch Lewis Prods., Inc., 862 P.2d 1207, 1210 (Nev. 1993). To state a claim for conspiracy to interfere with contractual relations a plaintiff must allege "a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." Hilton Hotels, 862 P.2d at 1210. In Nevada, however, a party cannot, as a matter of law, tortiously interfere with its own contract. See Bartsas Realty, Inc. v. Nash, 402 P.2d 650, 651 (Nev. 1965).

While Nevada courts have yet to address whether an agent of a principal, acting within the scope of his employment, is considered a third party as a matter of law, this Court has previously held that agents acting within the scope of their employment, i.e. the principal's interest, do not constitute intervening third parties, and therefore cannot tortiously interfere with a contract to which the principal is a party. See Alam v. Reno Hilton Corp., 819 F. Supp. 905, 911-12 (D. Nev. 1993) (citing Haigh v. Matsushita Elec. Corp. of Am., 676 F. Supp. 1332, 1349 (E.D. Va. 1987)). Accordingly, an agent acting outside the scope of his employment, or not in the principal's interest, may constitute an intervening third party and therefore may be held liable for tortious interference with a contract to which the principal is a party. See Shapoff v. Scull, 222 Cal. App.3d 1457, 1466 (Cal. Ct. App. 1990) (overruled on other grounds by Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454, 464 (Cal. 1994)).

Taking the allegations in Plaintiff's Amended Complaint as true and construing them in a light most favorable to Plaintiff, the Court cannot conclude beyond doubt that

1   Plaintiff can prove no set of facts in support of his intentional interference with contractual

2   relations claim.  Plaintiff alleges he had a valid and existing employment contract with

3   HRSM and Defendants knew about the contract.  In addition, Plaintiff alleges Metzger and

4   Ackerley intentionally interfered with Plaintiff and HRSM's contract and that such

5   interference disrupted Plaintiff and HRSM's contractual relationship.

6          Defendants argue because the Amended Complaint does not allege Defendants

7   were acting outside the scope of their employment and because "speculation and inferences

8   are not to be drawn from the Complaint[,]" the Court must dismiss Plaintiff's interference

9   with a contract claim.  (Defs.' Reply to Pl.'s Opp'n [Doc. #41] at 3.)  Defendants also argue

10  that because Plaintiff's conspiracy to interfere with a contract claim depends on his

11  interference with a contract claim, the Court should dismiss the conspiracy claim as well.

12  At this stage, however, the Court must take all allegations and reasonable inferences as true

13  and construe them in a light most favorable to the non-moving party.  Accordingly, looking

14  at Plaintiff's allegations in a light most favorable to Plaintiff, Plaintiff's allegations support

15  a reasonable inference that Metzger and Ackerley acted outside the scope of employment at

16  HRSM by taking broker reservations from HRSM and giving them to Ware, who allegedly

17  was offering outside brokers reservations and units.  The Court therefore will deny

18  Defendants' motion to dismiss Plaintiff's intentional interference with a contract and

19  conspiracy to interfere with a contract claims.

20          **C. Fraud**

21          Defendants contend this Court should dismiss Plaintiff's fraud claim because

22  Plaintiff failed to allege fraud with particularity.  In response, Plaintiff argues his

23  allegations are sufficiently detailed to satisfy Federal Rule of Civil Procedure 9(b)'s

24  heightened pleading requirements.

25          Federal Rule of Civil Procedure 9(b) requires a Plaintiff alleging fraud to state

26  with particularity the circumstances constituting fraud in the complaint.  Fed. R. Civ. P.

14

9(b).  To satisfy this burden, the complaint "'must set forth more than the neutral facts necessary to identify the transaction.'"  <u>Yourish v. Cal. Amplifier</u>, 191 F.3d 983, 993 (9th Cir. 1999) (footnote omitted) (quoting <u>In re GlenFed Sec. Litig.</u>, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc)).  The Ninth Circuit has defined "neutral facts" to mean the "'time, place, and content of an alleged misrepresentation.'"  <u>Id.</u> at 993 n.10 (quoting <u>GlenFed</u>, 42 F.3d at 1547-48).  In addition to the neutral facts, a plaintiff also must explain what is false about a statement and why it is false.  <u>Moore v. Kayport Package Express, Inc.</u>, 885 F.2d 531, 540 (9th Cir. 1989).  "[M]ere conclusory allegations of fraud are insufficient."  <u>Id.</u> However, courts must not "make Rule 9(b) carry more weight than it was meant to bear." <u>GlenFed</u>, 42 F.3d at 1554.  So long as the complaint sufficiently describes the circumstances of the alleged fraud so that the defendant is able adequately to respond, the complaint meets the particularity requirement of Rule 9(b).  <u>Cooper v. Pickett</u>, 137 F.3d 616, 627 (9th Cir. 1997).

The Amended Complaint provides a detailed account of a thirteen-month employment relationship during which Ackerley and Metzger allegedly made numerous fraudulent statements concerning Project sales, the Project's progression, financing for the Project, redesigning the Project, the whereabouts of customers' deposits, and the identity of HRSM's broker.  For example, the Amended Complaint alleges that "[i]n mid-May 2005, Plaintiff's assistant, Lisa Fortunato, discovered over 40 checks that potential buyers had submitted for initial reservation deposits, hidden inside an unlocked desk drawer in the sales office located at the Hard Rock Hotel."  (Am. Compl. at 7.)  The Amended Complaint further alleges Ackerley was supposed to deposit the checks at Nevada Title but never did. After repeated requests for information concerning his clients' deposit checks, Ackerley and Metzger allegedly provided Plaintiff with a list of clients showing whether their deposit checks had arrived at Nevada Title.  The Amended Complaint avers Plaintiff subsequently discovered numerous reservation deposit checks were "lost" while on their way to Nevada

Title and never were deposited.

The Amended Complaint states that several times during July 2005, Plaintiff asked Metzger and Ackerley whether Nevada Title received the reservation deposit checks that were "lost" during transfer.  The Amended Complaint then states Metzger and Ackerley told Plaintiff that Nevada Title had received all checks.  Plaintiff alleges, however, a Nevada Title representative later informed Plaintiff that Nevada Title was unable to determine the location of the deposit checks or whose checks were in fact deposited.

In paragraph 28, Plaintiff alleges in mid-March 2005, Ackerley and Metzger introduced Ware as HRSM's and HRCI's designated broker, but "stated that no outside brokers were being offered reservations for their clients; rather, Ware would work with outside brokers and would only receive information regarding potential clients who would then be passed onto the sales people such as Plaintiff."  (Am. Compl. at 5.)  In paragraph 46, Plaintiff alleges Ackerley and Metzger's statement was fraudulent because "Plaintiff discovered that Ray Ware was offering outside brokers reservations and selection of units for clients, contrary to Defendants Eric Metzger and Chad Ackerley [sic] representations that Ray Ware would not be offering outside brokers specific units for their clients."  (Am. Compl. at 8.)

Plaintiff provides similar detail throughout the Amended Complaint identifying who made various statements, when the statements were made[1], the statements' content, and why the statements are false.  Accordingly, the Amended Complaint sufficiently describes the alleged circumstances and statements constituting the fraud so that Defendants are able to respond adequately.  Therefore, the Court will deny Defendants' motion to

---

[1] The fact that Plaintiff did not specify the exact dates and times of each statement is not fatal. See Cooper, 137 F.3d at 627 (holding that allegations of fraud occurring in the "last two quarters of 1993 and the first quarter of 1994" satisfies the "when" requirement under Rule 9(b)).

1   dismiss Plaintiff's fraud claim.

2   **D.  Unfair & Deceptive Trade Practices**

3           Defendants argue Plaintiff's claim for unfair and deceptive trade practices fails

4   because no private cause of action exists under Chapter 598 of the Nevada Revised Statutes.

5   Defendants also contend even if a private cause of action exists under the statute, Plaintiff's

6   claim fails because he has not alleged any violations with particularity as Federal Rule of

7   Civil Procedure 9(b) requires.  In response, Plaintiff argues that while Chapter 598

8   generally provides for a public cause of action for deceptive trade practices, Nevada

9   Revised Statute § 41.600 provides for a private cause of action by persons who are victims

10  of consumer fraud, which includes those deceptive trade practices defined in Nevada

11  Revised Statutes § 598.0915 to § 598.0925.  Plaintiff also maintains his Amended

12  Complaint satisfies Rule 9(b)'s particularity requirement.

13          Nevada Revised Statute Chapter 598 "generally provides for a public cause of

14  action for deceptive trade practices."  Nev. Power Co. v. Eighth Judicial Dist. Court of

15  Nev., 102 P.3d 578, 583 n.7 (Nev. 2004).  However, Nevada Revised Statute § 41.600

16  provides that a victim of "consumer fraud" may assert a private cause of action.  Id.

17  Consumer fraud includes "[a] deceptive trade practice as defined in NRS 598.0915 to

18  598.0925, inclusive."  Id. (quoting Nev. Rev. Stat. 41.600(2)(d)).

19          Under Ninth Circuit law, "where fraud is not an essential element of a claim, only

20  allegations ('averments') of fraudulent conduct must satisfy the heightened pleading

21  requirements of Rule 9(b).  Allegations of non-fraudulent conduct need satisfy only the

22  ordinary notice pleading standards of Rule 8(a)."  Vess v. Ciba-Geigy Corp. USA, 317 F.3d

23  1097, 1104-05 (9th Cir. 2003).  Where, however, a plaintiff alleges a unified course of

24  fraudulent conduct and relies entirely on such conduct as the basis of a claim, the claim is

25  considered to be "grounded in fraud" and must satisfy Rule 9(b)'s particularity requirement.

26  Id. at 1103-04.  Thus, although termed "consumer fraud," the Court will apply Rule 9(b)

only to those deceptive trade practices claims that actually are grounded in fraud.

Plaintiff alleges Metzger and Ackerley engaged in four types of deceptive trade practices by: (1) making false representations[2]; (2) conducting business without all required state, county, or city licenses[3]; (3) failing to disclose material facts in connection with the sale of Project units[4]; and (4) violating state or federal statutes or regulations regarding the sale of Project units.[5]  Because Plaintiff's deceptive trade practices allegations fall under the definition of "consumer fraud," Plaintiff may assert a private cause of action notwithstanding his failure to allege he was doing so under Nevada Revised Statute § 41.600.

Plaintiff's first claim of deceptive trade practices alleges Metzger and Ackerley knowingly made false representations in a transaction.  This claim is grounded in fraud because Plaintiff relies on the same fraudulent statements here as he did for his fraud claim and therefore must satisfy Rule 9(b)'s particularity requirement.  For the reasons stated above in the Court's fraud analysis, Plaintiff has met the heightened pleading standard.  The Court therefore will deny Defendants' motion to dismiss Plaintiff's first claim of deceptive trade practices.

Plaintiff's second claim of deceptive trade practices alleges Metzger and Ackerley conducted business without all required licenses.  The Amended Complaint mentions licensing only once:

> In mid-May 2005, Defendant Eric Metzger informed the Plaintiff that he and Defendant Chad Ackerley were studying for the Real Estate Sales Persons licensing exam since they were dealing with clients on a

---

[2]  Nev. Rev. Stat. § 598.0915.15.

[3]  Nev. Rev. Stat. § 598.0923.1.

[4]  Nev. Rev. Stat. § 598.0923.2.

[5]  Nev. Rev. Stat. § 598.0923.3.

1

> day-to-day basis.  Defendant Chad Ackerley later told the Plaintiff that
> he did not intend to take the exam in order to obtain his license.

2

3   (Am. Comp. at 7.)  This claim is not grounded in fraud because Plaintiff did not allege

4   Metzger and Ackerley's failure to obtain the Real Estate Sales Person license was

5   fraudulent and did not rely on such failure in his fraud claim.  Accordingly, under the

6   ordinary notice pleading standard, Plaintiff has stated a claim against Metzger and Ackerley

7   because Plaintiff alleged Defendants conducted business without obtaining the Real Estate

8   Sales Person license.  The Court therefore will deny Defendants' motion to dismiss

9   Plaintiff's second deceptive trade practices claim.

10              Plaintiff's third deceptive trade practices claim alleges Metzger and Ackerley

11  failed to disclose material facts in connection with the sale of Project units.  Specifically,

12  Plaintiff alleges in March 2005, at the commencement of his sales efforts:

13
> Plaintiff asked Defendants Eric Metzger and Chad Ackerley on several
> occasions about the specifics of the Project, including the number of

14
> units, the size of the units, and the pricing for the units.  Defendants
> informed the Plaintiff that there was no unit specific paperwork

15
> regarding the Project.  Rather, Plaintiff was requested to Promote the
> "magic and mystery" of the Project to potential buyers.

16

17  (Am. Comp. at 5.)  In April 2005, Plaintiff alleges he asked Metzger and Ackerley for this

18  same information but these Defendants told Plaintiff no unit specific paperwork existed

19  regarding the Project and Plaintiff needed to sell the magic and mystery of the Project.  (Id.

20  at 6.)  Because Plaintiff did not aver Metzger and Ackerley's alleged failure to disclose

21  material facts was fraudulent, and did not base his fraud claim on such failure, the Court

22  will not apply Rule 9(b)'s particularity requirement to this claim.  Under Rule 8(a)'s

23  ordinary notice pleading standards, Plaintiff has stated a claim against Metzger and

24  Ackerley for failure to disclose material facts in connection with the sale of Project units.

25  The Court therefore will deny Defendants' motion to dismiss Plaintiff's third deceptive

26  trade practices claim.

Plaintiff's final deceptive trade practices claim alleges Defendants violated state or federal statutes or regulations regarding the sale of Project units.  Plaintiff's only mention of a state law violation relating to the sale of Project units appears in paragraph 47 of the Amended Complaint where Plaintiff states:

> During June 2005, numerous buyers contacted Plaintiff because they had never received confirmation of receipt on their first deposit. Plaintiff discovered that his client's reservation checks were never deposited because Defendant Chad Ackerley continued to store the checks in an unlocked desk drawer at the sales office.  Because Defendant Chad Ackerley continued to store the checks in an unlocked desk drawer, these checks were never turned over to Nevada Title in the timeframe required under Nevada real estate laws.

(Am. Compl. at 8.)  Because Plaintiff did not aver Ackerley's storage of deposit checks in a desk drawer was fraudulent and did not base his fraud claim on such conduct, the Court will not apply Rule 9(b)'s particularity requirement.  Under Rule 8(a)'s ordinary notice pleading standards, Plaintiff has stated a claim against Ackerley, but not Metzger.  Nowhere in the Amended Complaint does Plaintiff allege Metzger violated any federal or state laws or regulations.  Consequently, the Court will dismiss Plaintiff's fourth deceptive trade practices claim as to Defendant Metzger, but will deny Defendants' motion with respect to Defendant Ackerley.

**E.  Piercing the Corporate Veil & Punitive Damages**

Defendants contend this Court should dismiss Plaintiff's claims to "pierce the corporate veil" and for punitive damages because they are remedies and do not constitute independent causes of action.  In response, Plaintiff states "[c]learly, Plaintiff is pleading both corporate veil and punitive damages as claims for relief, and not as causes of action." (Pl.'s Opp'n to Def.'s Mot. to Dismiss at 18.)

The Court will not dismiss Plaintiff's request to pierce the corporate veil or for punitive damages because, as both parties recognize, these claims are not independent causes of action, but rather, are remedies and therefore there is nothing for the Court to

dismiss at this stage of the proceedings.  Therefore, the Court will deny Metzger and Ackerley's motion to dismiss Plaintiff's request to pierce the corporate veil and for punitive damages.

**IV.        CONCLUSION**

IT IS THEREFORE ORDERED that Defendants Eric Metzger and Chad Ackerley's Motion to Dismiss Plaintiff's Complaint and Supporting Memorandum of Law (Doc. #35) is hereby GRANTED in part and DENIED in part.  The motion is granted without prejudice with respect to Plaintiff's fourth deceptive trade practices claim as to Defendant Metzger only.  The motion is denied in all other respects.

DATED:   March 1, 2007

_____
PHILIP M. PRO
United States District Judge