1
2
3
4
                    UNITED STATES DISTRICT COURT

5
                         DISTRICT OF NEVADA

6
                                   * * *
                                        )
7   PATRICK GEORGE,                     )
                                        )
8             Plaintiff,                )
                                        )
9   v.                                  )        2:06-CV-1112-PMP-GWF
                                        )
10  PETER A. MORTON, et. al.,           )        O R D E R
                                        )
11            Defendants.               )
                                        )
    _____)
12

13          Presently before the Court is Defendant HRSM, Inc.'s ("HRSM") Motion to

14  Dismiss Plaintiff's Complaint and Supporting Memorandum of Law (Doc. #37), filed on

15  December 1, 2006.  On December 21, 2006, Plaintiff Patrick George filed an Opposition to

16  Defendant HRSM's Motion to Dismiss Plaintiff's Complaint (Doc. #42).  HRSM filed a

17  Reply (Doc. #46) on January 4, 2007.

18  **I.        BACKGROUND**

19          In 2004, Defendant Peter A. Morton ("Morton"), owner of Defendant Hard Rock

20  Hotel, Inc. ("Hard Rock"), announced an expansion project called the "Bungalow Flats

21  Residences at the Hard Rock Hotel & Casino," which would feature approximately 1,350

22  condominiums, along with various other resort facilities and amenities ("the Project").

23  (First Am. Comp. [Doc. #3] at 3.)  Defendant PM Realty, LLC ("PM Realty"), which

24  Morton manages, acquired the property on which the Project was to be built.  (Id.)

25  According to the Amended Complaint, Defendant HR Condominium Investors (Vegas)

26  LLC ("HRCI") was to own the Project.  (Id.)  HRCI's managers are PM Realty; Defendant

1  IDM Investments 1, LP ("IDM 1"); and Defendant IDM Investments 2, LP ("IDM 2").

2  (Id.)  Defendant Christopher Milam ("Milam") manages IDM 1 and IDM 2.  (Id.)

3  In February 2005, HRCI entered into an agreement with PM Realty to acquire the

4  Project property for approximately $86,000,000 dollars.  (Id.)  HRCI also contracted with

5  Defendant IDM Properties, LP ("IDM Properties"), which Milam manages, to be a

6  consultant for the Project.  (Id. at 4.)  At approximately the same time, HRCI contracted

7  with IDM Properties (Nevada), LLC ("IDM Nevada"), granting IDM Nevada the exclusive

8  right to market and sell the Project's condominiums ("Sales and Marketing Agreement").

9  (Id.)  Milam also manages IDM Nevada.  (Id.)  IDM Nevada subsequently assigned its

10  interest in the Sales and Marketing Agreement to Defendant HRSM.  (Id.)  Defendants Eric

11  Metzger ("Metzger"), Chad Ackerley ("Ackerley"), and Milam are HRSM's officers.

12  According to the Amended Complaint, in February 2005, Plaintiff entered into a

13  commission contract with HRSM to be a salesperson for the Project.  (Id.)  Plaintiff alleges

14  the terms of the contract were as follows:

15  A.  Plaintiff would be employed as a salesperson for HRSM from March 1, 2005

16  through October 1, 2005, with six-month renewable option periods upon which both parties

17  had to mutually agree.  (Id.)

18  B.  HRSM would pay Plaintiff 40% of his commissions after funding of the

19  construction loan and 60% upon actual closing upon move in.  (Id.)

20  C.  Plaintiff would receive a $4,000 per month draw against future commissions

21  until Plaintiff received his fist commissions out of the construction loan.  (Id.)

22  D.  Plaintiff's commission for "condotel" and luxury residences would be

23  approximately 0.5% for 1-35 units sold; 0.75% for 36-70 units sold; 1.0% for 71-105 units

24  sold; and 1.25% for 106-140 units sold.  (Id.)

25  E.  HRSM would pay bungalow commissions out of a pool with Plaintiff's

26  percentage of the pool being based upon Plaintiff's percentage of contribution to the

2

1    condotel and luxury units sold.  (Id.)

2        F.  The bungalows' commission scale provided for 1.0% payment of the total

3    sale.  (Id.)

4        G.  The bungalow commissions were to be paid according to the following

5    schedule relating to performance in selling condotel and luxury units: approximately 25%

6    earned commissions for 1-35 units sold; 50% of earned commissions for 36-70 units sold;

7    75% of earned commissions for 71-105 units sold; and 100% of earned commissions for

8    106-140 units sold.  (Id. at 4-5.)

9        H.  HRSM agreed to pay for one round trip per month between Las Vegas and

10   New York.  (Id. at 5.)

11       I.  HRSM agreed to reimburse Plaintiff for all reasonable sales related expenses.

12   (Id.)

13       J.  Each sales person only would be permitted to take reservations from clients

14   without brokers and HRSM salespersons would not engage in internal competition sales.

15   (Id.)

16       K.  Plaintiff would receive a 1.25% commission override on all properties Duke

17   Real Estate Group sold.  (Id.)

18       In March 2005, HRSM started marketing and selling the Project.  (Id.)

19   Defendants made numerous representations to Plaintiff promoting the quality and value of

20   the Project.  (Id.)  On multiple occasions, Plaintiff asked Metzger and Ackerley about the

21   Project's specifics, including the size of the units, the total number of units, and pricing

22   information.  (Id.)  Defendants allegedly informed Plaintiff no unit-specific paperwork

23   existed regarding the Project and Plaintiff had to promote the Project's "magic and

24   mystery" to potential buyers.  (Id.)

25       In mid-March 2005, Ackerley, Metzger, and Milam introduced Ray Ware

26   ("Ware") as HRSM and HRCI's designated broker and stated they were not offering outside

3

1    brokers reservations for their clients.  (Id.)  Instead, Ware would work with outside brokers

2    and would refer those brokers' potential clients to Plaintiff and HRSM's other sales people.

3    (Id.)    Around this same time, Metzger announced that Duke Realty Group would be the

4    only broker permitted to make Project sales and Plaintiff would receive a 1.25%

5    commission override on such sales as a bonus.  (Id. at 5-6.)  At the end of March 2005,

6    Plaintiff asked Metzger and Ackerley for a complete list of clients to determine the number

7    of reservations that had been taken up to that date and whether the buyers' reservation

8    deposits had been transferred to Nevada Title.  (Id. at 6.)  Metzger and Ackerly allegedly

9    told Plaintiff they were unable to give him a list containing this information.  (Id.)

10            In April 2005, Plaintiff again asked Metzger and Ackerley for unit-specific

11    information as well as a complete reservation list and information regarding whether the

12    buyers' deposits had been transferred to Nevada Title.  (Id.)  Metzger and Ackerly once

13    again told Plaintiff no unit-specific paper work existed and they were unable to provide a

14    complete reservation list or information concerning buyers' deposits at Nevada Title.  (Id.)

15    Plaintiff also alleges that in April 2005, Metzger and Ackerley encouraged Ware to take

16    broker client reservations and encouraged Plaintiff and other sales people to give all broker

17    client reservations to Ware.  (Id.)  On April 30, 2005, the weekend of the Hard Rock's 10th

18    anniversary event, Morton announced the Project was "sold out."  (Id.)  However, after the

19    announcement, Metzger, Ackerley, and Milam informed Plaintiff they had not completed

20    over 3,600 reservations yet, which meant the Project actually was not sold out.  (Id.)

21            During a sales meeting on May 3, 2005, Metzger and Ackerley informed Plaintiff

22    that the Project's units would be priced by June 15, 2005 and Plaintiff would receive pricing

23    information before June 1, 2005.  (Id. at 7.)  In mid-May 2005, Metzger told Plaintiff that

24    he and Ackerley were studying to take the Real Estate Sales Person licensing exam because

25    they were dealing with potential buyers on a daily basis.  (Id.)  However, Ackerley later told

26    Plaintiff he did not intend to take the exam to receive his license.  (Id.)  During this same

time, Plaintiff's sales assistant allegedly found over forty checks from potential buyers for reservation deposits inside an unlocked desk drawer in the sales office.  (Id.)  According to the Amended Complaint, Ackerley was supposed to deposit the checks but continued to store them in the desk drawer.  (Id.)  Throughout May 2005, Plaintiff continued to request a reservation list and Nevada Title deposit information but was never provided the information.  (Id.)

On June 1, 2005, Metzger and Ackerley gave Plaintiff a reservation list containing client information and whether a client's deposit check was transferred to Nevada Title.  (Id.)  Upon examination of the list, Plaintiff allegedly discovered that numerous reservation deposits were "lost" during transfer and thus never were deposited.  (Id.)  On June 4, 2005, Metzger, Ackerley, and Milam held a sales meeting to discuss the units, pricing, and amenities but upon Plaintiff's request for more specific information, Defendants repeatedly stated "I don't know," "I can't tell you that," or "we'll get back to you on that."  (Id. at 8.)

During June 2005, Metzger and Ackerley informed Plaintiff that the Project broker was not Ware, but instead Mike Gonyea, whom Plaintiff had never heard of or seen, and which change delayed Plaintiff's submission for his real estate license and contributed to the confusion with respect to who the broker was for HRSM.  (Id.)  Around that same time, the sales team put together Unit Specific Packages ("USPs") to send to buyers.  (Id.)  The USPs were supposed to consist of an agreement, pricing guides, and floor plans but numerous USPs were missing various pages, many buyers never received their USPs, and a legal department never reviewed the USPs' accuracy.  (Id.)  In addition, a number of buyers contacted Plaintiff inquiring as to whether their deposit checks had been transferred to Nevada Title because they had never received a confirmation.  (Id.)  Plaintiff allegedly discovered that his clients' reservation deposit checks were never transferred because Ackerley continued to keep the checks in an unlocked desk drawer at the sales office.  (Id.)

As a result, these checks were not transferred to Nevada Title in the time-frame required under Nevada law.  (Id.)

In July 2005, Plaintiff found out that Ware was offering outside brokers unit reservations for clients, despite Metzger and Ackerley's representations to the contrary. (Id.)  At the end of July 2005, Metzger, Ackerley, and Milam repeatedly represented to Plaintiff that the Project was on track and wanted Plaintiff to tell potential buyers the Project was sold out and for Plaintiff to highlight the importance of "getting in" the Project. (Id. at 8-9.)  Based on Defendants' representations, Plaintiff continued to market and sell Project units.  (Id. at 9.)  During this same time, Plaintiff asked Metzger and Ackerley on multiple occasions for an updated client reservation list to determine whether Nevada Title had ever received the "lost" deposit checks.  (Id.)  Although Metzger and Ackerley told Plaintiff that all checks arrived at Nevada Title, a Nevada Title representative allegedly informed Plaintiff that one check had been cut, which was to be sent to Chicago Title, but the representative was unable to determine where the money was, who had possession of it, and whose checks actually were deposited.  (Id.)

In August 2005, after Plaintiff received a list of which buyers were going to be placed in Towers 1, 2, and 3, Plaintiff asked Metzger, Ackerley, and Milam why Towers 4 and 5 were not listed and was told that Morton was looking to redesign the tops of these towers to fit more units.  (Id.)  However, when Plaintiff asked one of the architects for the Project whether Morton was redesigning Towers 4 and 5 the architect allegedly told Plaintiff that was not the case.  (Id.)  Throughout August 2005, Metzger, Ackerley, and Milam continued to reassure Plaintiff the Project was on track and represented that no Project had ever been in such demand and that this Project was the largest single residential release in North American history.  (Id.)  Based on these representations, Plaintiff continued to market and sell Project units.  (Id.)

///

During August 2005, buyers were being placed in different units than they had previously requested.  (Id.)  HRSM represented that if the buyers wanted to get into the Project they would have to take what was available and continuously stated that the units were "oversubscribed" and that Plaintiff and other sales persons needed to "spin" the situation by telling buyers they needed to be "flexible" due to unprecedented demand for the Project.  (Id. at 9-10.)

In September 2005, Metzger, Ackerley, and Milam announced that the tops of Towers 4 and 5 were going to be redesigned with fully furnished "Sky Studios" to accommodate the demand and that the Sky Studios were going to be the "hottest thing." (Id. at 10.)   Based on these representations, Plaintiff continued to market and sell these new units.  (Id.)  Metzger, Ackerley, and Milam continued to pressure Plaintiff to "get people into the Project" and to convince those not in units to buy a Sky Studio.  (Id.)  However, these Defendants told Plaintiff they were unable to give Plaintiff any information regarding the Sky Studios but to emphasize to potential buyers the "just getting in factor."  (Id.) Metzger, Ackerley, and Milam continued to represent to Plaintiff that the Project was progressing as scheduled and assured Plaintiff, and buyers, that they had "secured the largest single phase construction loan in North American history for 1.25 billion by Credit Suisse First Boston."  (Id. at 10-11.)

In mid-September 2005, Metzger, Ackerley, and Milam told Plaintiff that construction would be delayed until December 2005, but assured Plaintiff "everything was going forward."  (Id. at 11.)  Based on these representations, Plaintiff continued to market and sell Project units.  (Id.)  According to the Amended Complaint, at the end of September 2005, Milam told Plaintiff that Morton had switched interior designers three times, was increasing the Project's construction costs, and the profit margin was decreasing rapidly due to Morton's lack of knowledge and "ego-based decisions."  (Id.)

///

7

On October 12, 2005, Morton announced "the signing of a loan commitment" for $1.25 billion for construction of the Project with Credit Suisse. (<u>Id.</u>) Around this same time, HRSM sent contracts, signature pages, disclosures, floor plans, and information guides to buyers. (<u>Id.</u>) However, many buyers could not fully execute their contracts because signature pages or disclosure statements were missing. (<u>Id.</u>) When Plaintiff inquired about the incomplete contracts, Metzger, Ackerley, and Milam informed Plaintiff that the developer would execute everything and return it to the buyer, which would serve as the buyer's receipt and confirmation. (<u>Id.</u>) Plaintiff claims this never happened. (<u>Id.</u>) Defendants told Plaintiff to focus his efforts on getting more buyers into the Project instead of completing contracts for current buyers. (<u>Id.</u>)

In November 2005, Metzger, Ackerley, and Milam announced that construction would be delayed until February 2006, but reassured Plaintiff that the Project still was going forward. (<u>Id.</u> at 12.) Defendants advised Plaintiff "to offer clients a fully refundable 10% deposit, regardless of whether or not such clients had executed a contract." (<u>Id.</u>) According to the Amended Complaint, HRSM continued to maintain the Project was "sold out" but actually was holding units under fictitious client names so that representatives from Credit Suisse would see that these units were filled. (<u>Id.</u>)

On December 10, 2005, Milam informed Plaintiff that Morton had eliminated Milam from the Project because Metzger misrepresented to Morton that Milam "was not soliciting money from clients to fund his portion of responsibility for the development, and was instead using the money to fund other personal projects." (<u>Id.</u>) After repeated attempts to contact Metzger to find out whether Milam's statements were true, Metzger contacted Plaintiff and told him Milam "was a crook, and was stealing money from investors." (<u>Id.</u>) Metzger also told Plaintiff that Milam "had facilitated the loan to be released at a 90% absorption rate, even though Metzger had initially told Plaintiff that the actual absorption rate was 70%." (<u>Id.</u>) Consequently, Metzger led Plaintiff to believe he would be paid soon

since he was entitled to receive 40% of his commissions at the release of the construction loan.  (Id.)

In December 2005, Morton acquired control of HRCI, including the marketing and development agreements HRCI had with HRSM, and terminated the marketing agreements.  (Id.)  With Morton in control of HRCI, HRCI released PM Realty, which Morton also manages, from its obligation to sell the Project property to HRCI.  (Id.)  On or about February 21, 2006, Morton closed the Project's marketing office, dismissed the sales staff, and announced he was considering offers from numerous potential buyers to sell the Hard Rock Hotel & Casino as well as the Project and therefore placed the Project on "hold."  (Id. at 13.)  A short time later, Morton announced he had sold the Hard Rock Hotel & Casino, including the Project, and the Project was "cancelled."  (Id.)

According to the Amended Complaint, Plaintiff relied on Defendants' statements and representations and procured about 265 willing and able buyers for units at the Project.  (Id.)  Pursuant to his contract with HRSM, Plaintiff claims he is entitled to a 1.25% commission for each unit he sold at the project, a 1.25% commission override on all properties Duke Real Estate Group sold, a commission out of the bungalow pool, a percentage of Ware's internal sales, and a $4,000 per month draw up until the time the first commissions were supposed to be paid out of the construction loan.  (Id. at 13-14.)  To date, Plaintiff has been paid a few months of draw and some expenses.  (Id. at 14.)  Consequently, Plaintiff brings suit against Defendants claiming breach of contract, breach of the implied covenant of good faith and fair dealing, quantum meruit/unjust enrichment, intentional interference with a contract, conspiracy to interfere with a contract, fraud in the inducement, unfair and deceptive trade practices, that piercing the corporate veil is appropriate, and punitive damages.  (Id. at 14-21.)

In response, HRSM argues this Court should dismiss Plaintiff's Amended Complaint because HRSM did not breach the Commission Contract or the implied covenant

of good faith and fair dealing, Plaintiff is not allowed to assert a claim for quantum meruit or unjust enrichment as a matter of law, Plaintiff's claim for interference with a contract and conspiracy to interfere with a contract fail because HRSM cannot interfere with a contract to which HRSM is a party, Plaintiff has failed to allege fraud with particularity, no private cause of action exists under the unfair and deceptive trade practices statute, and claims to pierce the corporate veil and for punitive damages are remedies, not independent causes of action.

## II.        LEGAL STANDARD

In considering a motion to dismiss, "[a]ll allegations and reasonable inferences are taken as true, and the allegations are construed in the light most favorable to the non-moving party, but conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." Simpson v. AOL Time Warner, Inc., 452 F.3d 1040, 1046 (9th Cir. 2006) (quoting Adams v. Johnson, 355 F.3d 1179, 1183 (9th Cir. 2004)).  There is a strong presumption against dismissing an action for failure to state a claim.  See Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997) (citation omitted).  The issue is not whether the plaintiff ultimately will prevail, but whether he may offer evidence in support of his claims. Id. (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  Consequently, the Court may not grant a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Hicks v. Small, 69 F.3d 967, 969 (9th Cir. 1995).

The liberal rules of notice pleading set forth in the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts supporting his claim. See Yamaguchi v. United States Dep't of the Air Force, 109 F.3d 1475, 1481 (9th Cir. 1997) (quoting Conley v. Gibson, 355 U.S. at 47).  All the Rules require is a "short and plain statement" that adequately gives the defendant "fair notice of what the plaintiff's claim is

and the grounds upon which it rests." Id. at 1481 (citations and internal quotations omitted). A claim is sufficient if it shows that the plaintiff is entitled to any relief which the court can grant, even if the complaint asserts the wrong legal theory or asks for improper relief. See United States v. Howell, 318 F.2d 162, 166 (9th Cir. 1963).

**III.     DISCUSSION**

**A.  Breach of Contract**

HRSM contends Plaintiff is not entitled to any commissions because the conditions precedent to receipt of the commissions, funding of the construction loan and actual closing, did not occur due to Morton's cancellation of the Project. Plaintiff argues the Amended Complaint alleges he is entitled to receive at least 40% of his commissions because Credit Suisse "funded the loan" upon "signing a loan commitment" of $1.25 billion for construction of the Project.

The relevant terms of the Commission contract, as set forth in the Amended Complaint and taken as true for purposes of this motion, are as follows:

> B.  HRSM would pay Plaintiff 40% of his commissions after funding of the construction loan and 60% upon actual closing upon move in.
>
> C.  Plaintiff would receive a $4,000 per month draw against future commissions until Plaintiff received his first commissions out of the construction loan.

Although the parties dispute whether the "signing of a loan commitment" means Credit Suisse actually funded the loan, the Court presently need not decide that issue because Plaintiff has adequately stated a claim for breach of contract based on HRSM's alleged failure to pay Plaintiff his $4,000 per month draw. The Amended Complaint alleges Plaintiff was entitled to $4,000 per month draw until he received his first commissions out of the construction loan but avers Plaintiff only has "been paid a few months of draw . . . to date." (Am. Compl. at 14.) Consequently, the Court need not decide for purposes of this motion whether Credit Suisse funded the construction loan or the parties intended such

funding to be a true condition precedent because the Amended Complaint alleges a breach with regard to HRSM's failure to pay Plaintiff his draw each month in accordance with the employment contract.  Therefore, the Court will deny HRSM's motion to dismiss Plaintiff's breach of contract claim.

### B.  Breach of Implied Covenant of Good Faith and Fair Dealing

HRSM argues the Court should dismiss Plaintiff's claim for breach of the implied covenant of good faith and fair dealing for two reasons: (1) HRSM did not breach the employment contract and therefore could not have breached the implied covenant of good faith and fair dealing as a matter of law; and (2) no tortious breach of the implied covenant occurred because no special relationship existed between HRSM and Plaintiff.  In response, Plaintiff contends the Court should not dismiss its breach of implied covenant of good faith and fair dealing claim because HRSM breached the employment contract and HRSM and Plaintiff were in a special employment relationship.

Nevada law implies into every contract or agreement a covenant of good faith and fair dealing.  Hilton Hotels Corp. v. Butch Lewis Prods., Inc., 808 P.2d 919, 923 (Nev. 1991).  A party claiming breach of the implied covenant of good faith and fair dealing may bring a tort action or a contract action to recover for the breach.  See A.C. Shaw Constr. v. Washoe County, 784 P.2d 9, 10-11 (Nev. 1989) (stating "[t]he law would be incongruous if the covenant is implied in every contract, and yet the only remedy for breach of that covenant is if tort damages are alleged and there exists a special relationship between the tort victim and the tortfeasor"); Hilton Hotels, 808 P.2d at 923 (discussing "the difference between a tort action and contract action in good faith covenant cases" and their respective legal standards).  Because Plaintiff's Amended Complaint does not specify whether he bases his claim in tort or contract, the Court will analyze the Amended Complaint under both standards.

///

In a contract action, "[w]here the terms of a contract are literally complied with but one party to the contract deliberately countervenes [sic] the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing." Hilton Hotels, 808 P.2d at 922-23.  In this sense, the implied covenant of good faith and fair dealing "means that each party impliedly agrees not to do anything to destroy or injure the right of the other to receive the benefits of the contract" and has a "duty not to prevent or hinder performance by the other party."  Hilton Hotels, 808 P.2d at 923.  When a party performs a contract in a manner that is inconsistent with the purpose of the contract thereby denying the other party's justified expectations, a court may award damages against the party who did not act in good faith.  Id.  Whether a party's actions are contrary to the other party's reasonable expectations depends on "the various factors and special circumstances that shaped these expectations."  Id. at 923-24.

In a tort action, breach of the implied covenant of good faith and fair dealing arises only "in rare and exceptional cases" when a special relationship exists between the tortfeasor and the victim.  Ins. Co. of the W. v. Gibson Title Co., 134 P.3d 698, 702 (Nev. 2006).  A special relationship is characterized by elements of public interest, adhesion, reliance, and fiduciary responsibility.  Id.  A special relationship generally exists between insurers and insureds, franchisers and franchisees, and partners of partnerships.  Id.  It is also possible for a special relationship to exist between an employer and an employee.  See K Mart Corp. v. Ponsock, 732 P.2d 1364 (Nev. 1987); State, Univ. & Cmty. Coll. Sys. v. Sutton, 103 P.3d 8 (Nev. 2004).  However, "mere breach of an employment contract does not of itself give rise to tort damages" for breach of the covenant of good faith and fair dealing.  D'Angelo v. Gardner, 819 P.2d 206, 215 (Nev. 1991).

_____ "Tort liability for breach of the good faith covenant is appropriate where the party in the superior or entrusted position has engaged in grievous and perfidious misconduct."  Great Am. Ins. Co. v. General Builders, Inc., 934 P.2d 257, 263 (Nev. 1997) (internal

quotations omitted).  In such situations, ordinary contract damages may not be sufficient to "make the aggrieved, weaker, trusting party whole, and to fully punish the tortfeasor for his misdeeds." Id. (internal quotations omitted).  Nevada courts, however, have not imposed tort liability in certain relationships where contracts have been extensively negotiated and the injured party is a sophisticated businessman.  Id.

_____Taking Plaintiff's factual allegations as true and construing them in a light most favorable to Plaintiff, the Court cannot conclude beyond doubt that Plaintiff can prove no set of facts in support of his claim for breach of the implied covenant of good faith and fair dealing.  Plaintiff has stated a claim in contract because he alleged HRSM acted in a manner that contravened the spirit and purpose of the contract as well as his justified expectations.  The spirit and purpose of the contract was to enter into a mutually beneficial employment relationship where Plaintiff would use his best efforts to market and sell Project units in exchange for commissions, the amount of which would be determined by a variety of factors, including the volume of Plaintiff's sales.  The Amended Complaint alleges HRSM encouraged Ware to take outside brokers' client reservations despite its representations to Plaintiff that Ware would not offer outside brokers Project reservations for their clients but instead would refer outside brokers' clients to Plaintiff and HRSM's other sales people for reservations.  Such conduct may reasonably be viewed as conduct that injures Plaintiff's right to benefits under the contract and denies Plaintiff his justified expectations.  Moreover, HRSM's failure to deposit and "loss" of some of Plaintiff's clients' reservation checks, and refusal to provide Plaintiff accurate reservation deposit information reasonably may be viewed as conduct contrary to Plaintiff's justified expectation that HRSM properly would complete the reservation process for his clients so that he could receive his full commissions.

Plaintiff also has stated a claim for breach of the good faith covenant in tort. While breach of an employment contract alone is not enough to give rise to tort damages,

Plaintiff's Amended Complaint alleges HRSM made multiple misrepresentations, both to the public and Plaintiff, upon which Plaintiff relied, and that HRSM engaged in misconduct with respect to reservation deposits, brokering agreements, and its refusal to compensate Plaintiff. Such conduct reasonably may be viewed as grievous and perfidious. Further, Plaintiff did not allege he was a sophisticated businessman or that he extensively negotiated his contract with HRSM. Therefore, the Court will deny HRSM's motion to dismiss Plaintiff's breach of the covenant of good faith and fair dealing claim.

### C.  Unjust Enrichment/Quantum Meruit

HRSM argues that because Plaintiff alleges he was a party to an employment contract with HRSM, Plaintiff cannot also make a claim under quantum meruit or unjust enrichment as a matter of law. Plaintiff contends under Federal Rule of Civil Procedure 8(e) a party may plead in the alternative and therefore Plaintiff may state a claim both for breach of contract and unjust enrichment or quantum meruit.

Pursuant to Federal Rule of Civil Procedure 8(e)(2):

> A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.

The liberal policy reflected in Rule 8(e)(2) instructs courts not to construe a pleading "as an admission against another alternative or inconsistent pleading in the same case." McCalden v. Cal. Library Ass'n, 955 F.2d 1214, 1219 (9th Cir. 1990) (quoting Molsbergen v. United States, 757 F.2d 1016, 1019 (9th Cir. 1985)). Thus, although a plaintiff may not recover on both theories, "a plaintiff may claim these remedies as alternatives, leaving the ultimate election for the court." E.H. Boly & Son, Inc. v. Schneider, 525 F.2d 20, 23 n.3 (9th Cir. 1975); see also Hubbard Bus. Plaza v. Lincoln Liberty Life Ins. Co., 596 F. Supp. 344, 347

(D. Nev. 1984) (stating a "claimant is entitled to introduce his evidence in support of all his claims for relief; if he doesn't make an election among them, the trier of fact decides which, if any, to sustain.").

HRSM seeks to dismiss Plaintiff's equitable claim for unjust enrichment/quantum meruit because count one of Plaintiff's Amended Complaint alleges the existence of a contract.  Under Rule 8(e)(2), however, Plaintiff is entitled to plead in the alternative "as many separate claims or defenses as [Plaintiff] has regardless of consistency and whether based on legal, equitable, or maritime grounds."  Nevada's recognition of the rule disallowing recovery of equitable remedies where a plaintiff has a full and adequate remedy at law has no bearing on a plaintiff's right to plead in the alternative and to present evidence in support of all his well-pleaded claims for relief. At this stage of the litigation, the issue is not whether Plaintiff will prevail on his claim, but whether he may conduct discovery and offer evidence in support of his claim.   Alleging a valid employment contract exists does not prove its existence.  Consequently, if the Court were to conclude no valid employment contract existed, Plaintiff would have available an alternative theory for relief. The Court therefore will deny HRSM's motion to dismiss Plaintiff's unjust enrichment/quantum meruit claim because the Federal Rules of Civil Procedure permit Plaintiff to plead a claim for breach of contract and unjust enrichment/quatum meruit, notwithstanding their inconsistency.

### D.  Conspiracy to Interfere & Intentional Interference with a Contract

Plaintiff agrees to dismissal of his claims for conspiracy to interfere with a contract and intentional interference with a contract against HRSM.  Therefore, the Court will grant HRSM's motion to dismiss with respect to these causes of action.

### E.  Fraud

HRSM argues Plaintiff's fraud claim fails because Plaintiff did not plead with particularity the circumstances constituting fraud as Federal Rule of Civil Procedure 9(b)

requires.  Specifically, HRSM argues Plaintiff's Amended Complaint is conclusory, lacks

detail regarding the nature of the fraud, fails to identify specific dates, and fails to allege

HRSM engaged in any fraudulent activities.  Plaintiff responds that his Amended

Complaint satisfies the particularity requirement because it identifies the circumstances of

the fraud with enough detail that HRSM is able to prepare an adequate answer.  Plaintiff

also argues HRSM is vicariously liable for Metzger, Ackerley, and Milam's fraudulent

statements under the doctrine of respondeat superior.

      Federal Rule of Civil Procedure 9(b) requires a Plaintiff alleging fraud to state

with particularity the circumstances constituting fraud in the complaint.  Fed. R. Civ. P.

9(b).  To satisfy this burden, the complaint "'must set forth more than the neutral facts

necessary to identify the transaction.'"  Yourish v. Cal. Amplifier, 191 F.3d 983, 993 (9th

Cir. 1999) (footnote omitted) (quoting In re GlenFed Sec. Litig., 42 F.3d 1541, 1548 (9th

Cir. 1994) (en banc)).  The Ninth Circuit has defined "neutral facts" to mean the "'time,

place, and content of an alleged misrepresentation.'"  Id. at 993 n.10 (quoting GlenFed, 42

F.3d at 1547-48).  In addition to the neutral facts, a plaintiff also must explain what is false

about a statement and why it is false.  Moore v. Kayport Package Express, Inc., 885 F.2d

531, 540 (9th Cir. 1989).  "[M]ere conclusory allegations of fraud are insufficient."  Id.

However, courts must not "make Rule 9(b) carry more weight than it was meant to bear."

GlenFed, 42 F.3d at 1554.  So long as the complaint sufficiently describes the

circumstances of the alleged fraud so that the defendant adequately is able to respond, the

complaint meets the particularity requirement of Rule 9(b).  Cooper v. Pickett, 137 F.3d

616, 627 (9th Cir. 1997).  In terms of vicarious liability, if an officer of a corporation

commits a tort within the scope of the officer's employment, the corporation may be

vicariously liable under the respondeat superior doctrine.  Semenza v. Caughlin Crafted

Homes, 901 P.2d 684, 689 (Nev. 1995).

///

17

Plaintiff's Amended Complaint satisfies the crux of Rule 9(b)'s particularity requirement because it sufficiently sets forth the neutral facts and circumstances surrounding the allegedly fraudulent statements.  However, Plaintiff's allegations against HRSM fail in that Plaintiff did not allege Metzger, Ackerley, and Milam made fraudulent statements within the scope of their employment at HRSM.

The Amended Complaint provides a detailed account of a thirteen-month employment relationship during which HRSM's officers allegedly made numerous fraudulent statements concerning Project sales, the Project's progression, financing for the Project, redesigning the Project, the whereabouts of customers' deposits, and the identity of HRSM's broker.  For example, the Amended Complaint alleges that "[i]n mid-May 2005, Plaintiff's assistant, Lisa Fortunato, discovered over 40 checks that potential buyers had submitted for initial reservation deposits, hidden inside an unlocked desk drawer in the sales office located at the Hard Rock Hotel."  (Am. Compl. at 7.)  The Amended Complaint further alleges Ackerley was supposed to deposit the checks at Nevada Title but never did. After repeated requests for information concerning his clients' deposit checks, Ackerley and Metzger allegedly provided Plaintiff with a list of clients showing whether their deposit checks had arrived at Nevada Title.  The Amended Complaint avers Plaintiff subsequently discovered numerous reservation deposit checks were "lost" while on their way to Nevada Title and never were deposited.

The Amended Complaint states that several times during July 2005, Plaintiff asked Metzger and Ackerley whether Nevada Title received the reservation deposit checks that were "lost" during transfer.  The Amended Complaint then states Metzger and Ackerley told Plaintiff that Nevada Title had received all checks.  Plaintiff alleges, however, a Nevada Title representative later informed Plaintiff that Nevada Title was unable to determine the location of the deposit checks or whose checks were deposited. Plaintiff provides similar detail throughout the Amended Complaint identifying

who made various statements, when the statements were made[1], the statements' content, and why the statements are false.  However, notwithstanding Plaintiff's satisfaction of these requirements, HRSM's vicarious liability depends on its employees, managers, and owners' conduct occurring within the scope of their employment.  Plaintiff failed to allege Metzger, Ackerley, and Milam's allegedly fraudulent statements occurred within the scope of their employment at HRSM.  Given the heightened pleading standards under Rule 9(b) and the fact that Plaintiff's fraud claim against HRSM hinges on vicarious liability, the Court will dismiss Plaintiff's fraud claim with leave to amend to allege Metzger, Ackerley, and Milam acted within the scope of their employment at HRSM at the time they made their allegedly fraudulent statements.

### F.  Unfair & Deceptive Trade Practices

HRSM argues Plaintiff's claim for unfair and deceptive trade practices fails because no private cause of action exists under Chapter 598 of the Nevada Revised Statutes.  HRSM also contends even if a private cause of action exists under the statute, Plaintiff's claim fails because he has not alleged any violations with particularity.  In response, Plaintiff argues that while Chapter 598 generally provides for a public cause of action for deceptive trade practices, Nevada Revised Statute § 41.600 provides for a private cause of action by persons who are victims of consumer fraud, which, according to the statute, includes those deceptive trade practices defined in Nevada Revised Statutes § 598.0915 to § 598.0925.  Plaintiff also maintains his Amended Complaint satisfies Rule 9(b)'s particularity requirement.

Nevada Revised Statute Chapter 598 "generally provides for a public cause of action for deceptive trade practices."  <u>Nev. Power Co. v. Eighth Judicial Dist. Court of</u>

---

[1]  The fact that Plaintiff did not specify the exact dates and times of each statement is not fatal.  <u>See</u> <u>Cooper</u>, 137 F.3d at 627 (holding that allegations of fraud occurring in the "last two quarters of 1993 and the first quarter of 1994" satisfies the "when" requirement under Rule 9(b)).

Nev., 102 P.3d 578, 583 n.7 (Nev. 2004).  However, Nevada Revised Statute § 41.600 provides that a victim of "consumer fraud" may assert a private cause of action.  Id. Consumer fraud includes "[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive."  Id. (quoting Nev. Rev. Stat. § 41.600(2)(d)).

Under Ninth Circuit law, "where fraud is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b).  Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)."  Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1104-05 (9th Cir. 2003).  Where, however, a plaintiff alleges a unified course of fraudulent conduct and relies entirely on such conduct as the basis of a claim, the claim is considered to be "grounded in fraud" and must satisfy Rule 9(b)'s particularity requirement. Id. at 1103-04.  Thus, although termed "consumer fraud," the Court will apply Rule 9(b) only to those deceptive trade practices claims that actually are grounded in fraud.

Plaintiff alleges HRSM engaged in four types of deceptive trade practices by: (1) knowingly making false representations in a transaction[2]; (2) conducting business without all required state, county, or city licenses[3]; (3) failing to disclose material facts in connection with the sale of Project units[4]; and (4) violating state or federal statutes or regulations regarding the sale of Project units.[5]  Because Plaintiff's deceptive trade practices allegations fall under the definition of "consumer fraud," Plaintiff may assert a private cause of action notwithstanding his failure to allege he was doing so under Nevada Revised Statute § 41.600.

---

[2]  Nev. Rev. Stat. § 598.0915.15.

[3]  Nev. Rev. Stat. § 598.0923.1.

[4]  Nev. Rev. Stat. § 598.0923.2.

[5]  Nev. Rev. Stat. § 598.0923.3.

Plaintiff's first deceptive trade practices claim alleges HRSM knowingly made false representations in a transaction.  This claim is grounded in fraud because Plaintiff relies on the same fraudulent statements here as he did for his fraud claim.  Plaintiff therefore must satisfy Rule 9(b)'s particularity requirement.  As stated above, while Plaintiff has stated this claim with sufficient detail, the claim fails because Plaintiff's claim against HRSM is based on a theory of vicarious liability and Plaintiff did not allege Metzger, Ackerley, and Milam made false representations within the scope of their employment, which the heightened pleading standard requires.  Consequently, the Court will dismiss Plaintiff's first claim of deceptive trade practices without prejudice for failure to allege Metzger, Ackerley, and Milam made false representations within the scope of their employment at HRSM.

Plaintiff's second deceptive trade practices claim alleges HRSM conducted business without all required licenses.  The Amended Complaint mentions licensing only once:

> In mid-May 2005, Defendant Eric Metzger informed the Plaintiff that he and Defendant Chad Ackerley were studying for the Real Estate Sales Persons licensing exam since they were dealing with clients on a day-to-day basis.  Defendant Chad Ackerley later told the Plaintiff that he did not intend to take the exam in order to obtain his license.

(Am. Comp. at 7.)  This claim is not grounded in fraud because Plaintiff did not allege Metzger and Ackerley's failure to obtain the Real Estate Sales Person license was fraudulent and did not rely on such failure in his fraud claim.  Accordingly, under the ordinary notice pleading standard, Plaintiff has stated a claim against HRSM because Plaintiff alleged HRSM's officers conducted business without all required licenses thereby putting HRSM on notice of its potential vicarious liability.  The Court therefore will deny HRSM's motion to dismiss Plaintiff's second deceptive trade practices claim.

Plaintiff's third deceptive trade practices claim alleges HRSM failed to disclose material facts in connection with the sale of Project units.  Specifically, Plaintiff alleges in

March 2005, at the commencement of his sales efforts:

> Plaintiff asked Defendants Eric Metzger and Chad Ackerley on several occasions about the specifics of the Project, including the number of units, the size of the units, and the pricing for the units.  Defendants informed the Plaintiff that there was not unit specific paperwork regarding the Project.  Rather, Plaintiff was requested to Promote the "magic and mystery" of the Project to potential buyers.

(Am. Comp. at 5.)  In April 2005, Plaintiff alleges he asked Metzger and Ackerley for this same information but Metzger and Ackerley told Plaintiff no unit specific paperwork existed regarding the Project and Plaintiff needed to sell the magic and mystery of the Project.  (Id. at 6.)  Because Plaintiff did not aver HRSM's alleged failure to disclose material facts was fraudulent, and did not base his fraud claim on such failure, the Court will not apply Rule 9(b)'s particularity requirement to this claim.  Under Rule 8(a)'s ordinary notice pleading standards, Plaintiff has stated a claim against HRSM for failure to disclose material facts in connection with the sale of Project units because Plaintiff alleged HRSM's officers failed to disclose such material facts thereby putting HRSM on notice of its potential vicarious liability.  The Court therefore will deny HRSM's motion to dismiss this deceptive trade practices claim.

Plaintiff's fourth deceptive trade practices claim alleges HRSM violated a state or federal statute or regulation relating to the sale of Project units.  Plaintiff's only mention of a state law violation relating to the sale of Project units appears in paragraph 47 of the Amended Complaint where Plaintiff states "[b]ecause Defendant Chad Ackerley continued to store the checks in an unlocked desk drawer, these checks were never turned over to Nevada Title in the timeframe required under Nevada real estate laws."  (Am. Compl. at 8.)  Because Plaintiff did not aver Ackerley's storage of deposit checks in a desk drawer was fraudulent and did not base his fraud claim on such conduct, the Court will not apply Rule 9(b)'s particularity requirement.  Under Rule 8(a)'s ordinary notice pleading standards, Plaintiff has stated a claim against HRSM for violation of state statutes or regulations

because Plaintiff alleged one of HRSM's officers violated a state law or regulation thereby putting HRSM on notice of its potential vicarious liability.  The Court therefore will deny HRSM's motion to dismiss this deceptive trade practices claim.

### G.  Piercing the Corporate Veil & Punitive Damages

HRSM contends this Court should dismiss Plaintiff's claims to "pierce the corporate veil" and for punitive damages because they are remedies and do not constitute independent causes of action.  In response, Plaintiff states "[c]learly, Plaintiff is pleading both corporate veil and punitive damages as claims for relief, and not as causes of action." (Pl.'s Opp'n to Def.'s Mot. to Dismiss at 18.)

The Court will not dismiss Plaintiff's requests to pierce the corporate veil or for punitive damages because, as both parties recognize, these claims are not independent causes of action, but rather, are remedies and therefore there is nothing for the Court to dismiss at this stage in the proceedings.  The Court will deny HRSM's motion to dismiss Plaintiff's claim to pierce the corporate veil and for punitive damages.

**IV.     CONCLUSION**

IT IS THEREFORE ORDERED that Defendant HRSM, Inc.'s Motion to Dismiss Plaintiff's Complaint and Supporting Memorandum of Law (Doc. #37) is hereby GRANTED in part and DENIED in part.  The motion is granted with prejudice with respect to Plaintiff's intentional interference with a contract claim and conspiracy to interfere with a contract claim.  The motion is granted without prejudice as to Plaintiff's fraud claim and first deceptive trade practices claim.  The motion is denied in all other respects.


DATED:  March 1, 2007


_____
PHILIP M. PRO
United States District Judge