1

2

3

4                      UNITED STATES DISTRICT COURT

5                           DISTRICT OF NEVADA

6                                   * * *
                                      )
7    PATRICK GEORGE,                  )
                                      )
8             Plaintiff,              )
                                      )
9    v.                               )        2:06-CV-1112-PMP-GWF
                                      )
10   PETER A. MORTON, et. al.,        )        O R D E R
                                      )
11            Defendants.             )
     _____)
12

13            Presently before the Court is Defendants Peter Morton, Hard Rock Hotel, Inc.,

14   HR Condominium Investors (Vegas), LLC and PM Realty, LLC's Motion to Dismiss (Doc.

15   #39), filed on December 7, 2006.  On January 2, 2007, Plaintiff Patrick George filed an

16   Opposition (Doc. #45) to Defendants' Motion to Dismiss.  Defendants filed a Reply (Doc.

17   #51) on January 16, 2007.

18   **I.       BACKGROUND**

19            In 2004, Defendant Peter A. Morton ("Morton"), owner of Defendant Hard Rock

20   Hotel, Inc. ("Hard Rock"), announced an expansion project called the "Bungalow Flats

21   Residences at the Hard Rock Hotel & Casino," which would feature approximately 1,350

22   condominiums, along with various other resort facilities and amenities ("the Project").

23   (First Am. Comp. [Doc. #3] at 3.)  Defendant PM Realty, LLC ("PM Realty"), which

24   Morton manages, acquired the property on which the Project was to be built.  (Id.)

25   According to the Amended Complaint, Defendant HR Condominium Investors (Vegas)

26   LLC ("HRCI") was to own the Project.  (Id.)  HRCI's managers are PM Realty; Defendant

1   IDM Investments 1, LP ("IDM 1"); and Defendant IDM Investments 2, LP ("IDM 2").

2   (Id.)  Defendant Christopher Milam ("Milam") manages IDM 1 and IDM 2.  (Id.)

3          In February 2005, HRCI entered into an agreement with PM Realty to acquire the

4   Project property for approximately $86,000,000 dollars.  (Id.)  HRCI also contracted with

5   Defendant IDM Properties, LP ("IDM Properties"), which Milam manages, to be a

6   consultant for the Project.  (Id. at 4.)  At approximately the same time, HRCI contracted

7   with IDM Properties (Nevada), LLC ("IDM Nevada"), granting IDM Nevada the exclusive

8   right to market and sell the Project's condominiums ("Sales and Marketing Agreement").

9   (Id.)  Milam also manages IDM Nevada.  (Id.)  IDM Nevada subsequently assigned its

10  interest in the Sales and Marketing Agreement to Defendant HRSM.  (Id.)  Defendants Eric

11  Metzger ("Metzger"), Chad Ackerley ("Ackerley"), and Milam are HRSM's officers.

12         According to the Amended Complaint, in February 2005, Plaintiff entered into a

13  commission contract with HRSM to be a salesperson for the Project.  (Id.)  Plaintiff alleges

14  the terms of the contract were as follows:

15         A.  Plaintiff would be employed as a salesperson for HRSM from March 1, 2005

16  through October 1, 2005, with six-month renewable option periods upon which both parties

17  had to mutually agree.  (Id.)

18         B.  HRSM would pay Plaintiff 40% of his commissions after funding of the

19  construction loan and 60% upon actual closing upon move in.  (Id.)

20         C.  Plaintiff would receive a $4,000 per month draw against future commissions

21  until Plaintiff received his fist commissions out of the construction loan.  (Id.)

22         D.  Plaintiff's commission for "condotel" and luxury residences would be

23  approximately 0.5% for 1-35 units sold; 0.75% for 36-70 units sold; 1.0% for 71-105 units

24  sold; and 1.25% for 106-140 units sold.  (Id.)

25         E.  HRSM would pay bungalow commissions out of a pool with Plaintiff's

26  percentage of the pool being based upon Plaintiff's percentage of contribution to the

1   condotel and luxury units sold.  (Id.)

2        F.  The bungalows' commission scale provided for 1.0% payment of the total

3   sale.  (Id.)

4        G.  The bungalow commissions were to be paid according to the following

5   schedule relating to performance in selling condotel and luxury units: approximately 25%

6   earned commissions for 1-35 units sold; 50% of earned commissions for 36-70 units sold;

7   75% of earned commissions for 71-105 units sold; and 100% of earned commissions for

8   106-140 units sold.  (Id. at 4-5.)

9        H.  HRSM agreed to pay for one round trip per month between Las Vegas and

10  New York.  (Id. at 5.)

11       I.  HRSM agreed to reimburse Plaintiff for all reasonable sales related expenses.

12  (Id.)

13       J.  Each sales person only would be permitted to take reservations from clients

14  without brokers and HRSM salespersons would not engage in internal competition sales.

15  (Id.)

16       K.  Plaintiff would receive a 1.25% commission override on all properties Duke

17  Real Estate Group sold.  (Id.)

18       In March 2005, HRSM started marketing and selling the Project.  (Id.)

19  Defendants made numerous representations to Plaintiff promoting the quality and value of

20  the Project.  (Id.)  On multiple occasions, Plaintiff asked Metzger and Ackerley about the

21  Project's specifics, including the size of the units, the total number of units, and pricing

22  information.  (Id.)  Defendants allegedly informed Plaintiff no unit-specific paperwork

23  existed regarding the Project and Plaintiff had to promote the Project's "magic and

24  mystery" to potential buyers.  (Id.)

25       In mid-March 2005, Ackerley, Metzger, and Milam introduced Ray Ware

26  ("Ware") as HRSM and HRCI's designated broker and stated they were not offering outside

3

1   brokers reservations for their clients.  (Id.)  Instead, Ware would work with outside brokers

2   and would refer those brokers' potential clients to Plaintiff and HRSM's other sales people.

3   (Id.)   Around this same time, Metzger announced that Duke Realty Group would be the

4   only broker permitted to make Project sales and Plaintiff would receive a 1.25%

5   commission override on such sales as a bonus.  (Id. at 5-6.)  At the end of March 2005,

6   Plaintiff asked Metzger and Ackerley for a complete list of clients to determine the number

7   of reservations that had been taken up to that date and whether the buyers' reservation

8   deposit had been transferred to Nevada Title.  (Id. at 6.)  Metzger and Ackerly allegedly told

9   Plaintiff they were unable to give him a list containing this information.  (Id.)

10          In April 2005, Plaintiff again asked Metzger and Ackerley for unit-specific

11   information as well as a complete reservation list and information regarding whether the

12   buyers' deposits had been transferred to Nevada Title.  (Id.)  Metzger and Ackerly once

13   again told Plaintiff no unit-specific paper work existed and they were unable to provide a

14   complete reservation list or information concerning buyers' deposits at Nevada Title.  (Id.)

15   Plaintiff also alleges that in April 2005, Metzger and Ackerley encouraged Ware to take

16   broker client reservations and encouraged Plaintiff and other sales people to give all broker

17   client reservations to Ware.  (Id.)  On April 30, 2005, the weekend of the Hard Rock's 10th

18   anniversary event, Morton announced the Project was "sold out."  (Id.)  However, after the

19   announcement, Metzger, Ackerley, and Milam informed Plaintiff they had not completed

20   over 3,600 reservations yet, which meant the Project actually was not sold out.  (Id.)

21          During a sales meeting on May 3, 2005, Metzger and Ackerley informed Plaintiff

22   that the Project's units would be priced by June 15, 2005 and Plaintiff would receive pricing

23   information before June 1, 2005.  (Id. at 7.)  In mid-May 2005, Metzger told Plaintiff that

24   he and Ackerley were studying to take the Real Estate Sales Person licensing exam because

25   they were dealing with potential buyers on a daily basis.  (Id.)  However, Ackerley later told

26   Plaintiff he did not intend to take the exam to receive his license.  (Id.)  During this same

1   time, Plaintiff's sales assistant allegedly found over forty checks from potential buyers for

2   reservation deposits inside an unlocked desk drawer in the sales office.  (Id.)  According to

3   the Amended Complaint, Ackerley was supposed to deposit the checks but continued to

4   store them in the desk drawer.  (Id.)  Throughout May 2005, Plaintiff continued to request a

5   reservation list and Nevada Title deposit information but was never provided the

6   information.  (Id.)

7          On June 1, 2005, Metzger and Ackerley gave Plaintiff a reservation list

8   containing client information and whether a client's deposit check was transferred to

9   Nevada Title.  (Id.)  Upon examination of the list, Plaintiff allegedly discovered that

10  numerous reservation deposits were "lost" during transfer and thus never were deposited.

11  (Id.)  On June 4, 2005, Metzger, Ackerley, and Milam held a sales meeting to discuss the

12  units, pricing, and amenities but upon Plaintiff's request for more specific information,

13  Defendants repeatedly stated "I don't know," "I can't tell you that," or "we'll get back to

14  you on that."  (Id. at 8.)

15         During June 2005, Metzger and Ackerley informed Plaintiff that the Project

16  broker was not Ware, but instead Mike Gonyea, whom Plaintiff had never heard of or seen,

17  and which change delayed Plaintiff's submission for his real estate license and contributed

18  to the confusion with respect to who the broker was for HRSM.  (Id.)  Around that same

19  time, the sales team put together Unit Specific Packages ("USPs") to send to buyers.  (Id.)

20  The USPs were supposed to consist of an agreement, pricing guides, and floor plans but

21  numerous USPs were missing various pages, many buyers never received their USPs, and a

22  legal department never reviewed the USPs' accuracy.  (Id.)  In addition, a number of buyers

23  contacted Plaintiff inquiring as to whether their deposit checks had been transferred to

24  Nevada Title because they had never received a confirmation.  (Id.)  Plaintiff allegedly

25  discovered that his clients' reservation deposit checks were never transferred because

26  Ackerley continued to keep the checks in an unlocked desk drawer at the sales office.  (Id.)

As a result, these checks were not transferred to Nevada Title in the time-frame required under Nevada law.  (Id.)

In July 2005, Plaintiff found out that Ware was offering outside brokers unit reservations for clients, despite Metzger and Ackerley's representations to the contrary. (Id.)  At the end of July 2005, Metzger, Ackerley, and Milam repeatedly represented to Plaintiff that the Project was on track and wanted Plaintiff to tell potential buyers the Project was sold out and for Plaintiff to highlight the importance of "getting in" the Project. (Id. at 8-9.)  Based on Defendants' representations, Plaintiff continued to market and sell Project units.  (Id. at 9.)  During this same time, Plaintiff asked Metzger and Ackerley on multiple occasions for an updated client reservation list to determine whether Nevada Title had ever received the "lost" deposit checks.  (Id.)  Although Metzger and Ackerley told Plaintiff that all checks arrived at Nevada Title, a Nevada Title representative allegedly informed Plaintiff that one check had been cut, which was to be sent to Chicago Title, but the representative was unable to determine where the money was, who had possession of it, and whose checks actually were deposited.  (Id.)

In August 2005, after Plaintiff received a list of which buyers were going to be placed in Towers 1, 2, and 3, Plaintiff asked Metzger, Ackerley, and Milam why Towers 4 and 5 were not listed and was told that Morton was looking to redesign the tops of these towers to fit more units.  (Id.)  However, when Plaintiff asked one of the architects for the Project whether Morton was redesigning Towers 4 and 5 the architect allegedly told Plaintiff that was not the case.  (Id.)  Throughout August 2005, Metzger, Ackerley, and Milam continued to reassure Plaintiff the Project was on track and represented that no Project had ever been in such demand and that this Project was the largest single residential release in North American history.  (Id.)  Based on these representations, Plaintiff continued to market and sell Project units.  (Id.)

///

During August 2005, buyers were being placed in different units than they had previously requested.  (<u>Id.</u>)  HRSM represented that if the buyers wanted to get into the Project they would have to take what was available and continuously stated that the units were "oversubscribed" and that Plaintiff and other sales persons needed to "spin" the situation by telling buyers they needed to be "flexible" due to unprecedented demand for the Project.  (<u>Id.</u> at 9-10.)

In September 2005, Metzger, Ackerley, and Milam announced that the tops of Towers 4 and 5 were going to be redesigned with fully furnished "Sky Studios" to accommodate the demand and that the Sky Studios were going to be the "hottest thing." (<u>Id.</u> at 10.)   Based on these representations, Plaintiff continued to market and sell these new units.  (<u>Id.</u>)  Metzger, Ackerley, and Milam continued to pressure Plaintiff to "get people into the Project" and to convince those not in units to buy a Sky Studio.  (<u>Id.</u>)  However, these Defendants told Plaintiff they were unable to give Plaintiff any information regarding the Sky Studios but to emphasize to potential buyers the "just getting in factor."  (<u>Id.</u>) Metzger, Ackerley, and Milam continued to represent to Plaintiff that the Project was progressing as scheduled and assured Plaintiff, and buyers, that they had "secured the largest single phase construction loan in North American history for 1.25 billion by Credit Suisse First Boston."  (<u>Id.</u> at 10-11.)

In mid-September 2005, Metzger, Ackerley, and Milam told Plaintiff that construction would be delayed until December 2005, but assured Plaintiff "everything was going forward."  (<u>Id.</u> at 11.)  Based on these representations, Plaintiff continued to market and sell Project units.  (<u>Id.</u>)  According to the Amended Complaint, at the end of September 2005, Milam told Plaintiff that Morton had switched interior designers three times, was increasing the Project's construction costs, and the profit margin was decreasing rapidly due to Morton's lack of knowledge and "ego-based decisions."  (<u>Id.</u>)

///

On October 12, 2005, Morton announced "the signing of a loan commitment" for $1.25 billion for construction of the Project with Credit Suisse. (Id.)  Around this same time, HRSM sent contracts, signature pages, disclosures, floor plans, and information guides to buyers. (Id.)  However, many buyers could not fully execute their contracts because signature pages or disclosure statements were missing. (Id.)  When Plaintiff inquired about the incomplete contracts, Metzger, Ackerley, and Milam informed Plaintiff that the developer would execute everything and return it to the buyer, which would serve as the buyer's receipt and confirmation. (Id.)  Plaintiff claims this never happened. (Id.)  Defendants told Plaintiff to focus his efforts on getting more buyers into the Project instead of completing contracts for current buyers. (Id.)

In November 2005, Metzger, Ackerley, and Milam announced that construction would be delayed until February 2006, but reassured Plaintiff that the Project still was going forward. (Id. at 12.)  Defendants advised Plaintiff "to offer clients a fully refundable 10% deposit, regardless of whether or not such clients had executed a contract." (Id.)  According to the Amended Complaint, HRSM continued to maintain the Project was "sold out" but actually was holding units under fictitious client names so that representatives from Credit Suisse would see that these units were filled. (Id.)

On December 10, 2005, Milam informed Plaintiff that Morton had eliminated Milam from the Project because Metzger misrepresented to Morton that Milam "was not soliciting money from clients to fund his portion of responsibility for the development, and was instead using the money to fund other personal projects." (Id.)  After repeated attempts to contact Metzger to find out whether Milam's statements were true, Metzger contacted Plaintiff and told him Milam "was a crook, and was stealing money from investors." (Id.)  Metzger also told Plaintiff that Milam "had facilitated the loan to be released at a 90% absorption rate, even though Metzger had initially told Plaintiff that the actual absorption rate was 70%." (Id.)  Consequently, Metzger led Plaintiff to believe he would be paid soon

since he was entitled to receive 40% of his commissions at the release of the construction loan.  (Id.)

In December 2005, Morton acquired control of HRCI, including the marketing and development agreements HRCI had with HRSM, and terminated the marketing agreements.  (Id.)  With Morton in control of HRCI, HRCI released PM Realty, which Morton also manages, from its obligation to sell the Project property to HRCI.  (Id.)  On or about February 21, 2006, Morton closed the Project's marketing office, dismissed the sales staff, and announced he was considering offers from numerous potential buyers to sell the Hard Rock Hotel & Casino as well as the Project and therefore placed the Project on "hold."  (Id. at 13.)  A short time later, Morton announced he had sold the Hard Rock Hotel & Casino, including the Project, and the Project was "cancelled."  (Id.)

According to the Amended Complaint, Plaintiff relied on Defendants' statements and representations and procured about 265 willing and able buyers for units at the Project.  (Id.)  Pursuant to his contract with HRSM, Plaintiff claims he is entitled to a 1.25% commission for each unit he sold at the project, a 1.25% commission override on all properties Duke Real Estate Group sold, a commission out of the bungalow pool, a percentage of Ware's internal sales, and a $4,000 per month draw up until the time the first commissions were supposed to be paid out of the construction loan.  (Id. at 13-14.)  To date, Plaintiff has been paid a few months of draw and some expenses.  (Id. at 14.)  Consequently, Plaintiff brings suit against Defendants claiming breach of contract, breach of the implied covenant of good faith and fair dealing, quantum meruit/unjust enrichment, intentional interference with a contract, conspiracy to interfere with a contract, fraud in the inducement, unfair and deceptive trade practices, that piercing the corporate veil is appropriate, and punitive damages.  (Id. at 14-21.)

Defendants Morton, Hard Rock, HRCI, and PM Realty move to dismiss Plaintiff's Amended Complaint arguing Plaintiff is not allowed to assert a claim for

quantum meruit or unjust enrichment as a matter of law, Plaintiff's claim for interference with a contract and conspiracy to interfere with a contract fail because these Defendants have a financial interest in HRSM and Plaintiff's contract, Plaintiff has failed to allege fraud with particularity, no private cause of action exists under the unfair and deceptive trade practices statute, and claims to pierce the corporate veil and for punitive damages are remedies, not independent causes of action.

## II.        LEGAL STANDARD

In considering a motion to dismiss, "[a]ll allegations and reasonable inferences are taken as true, and the allegations are construed in the light most favorable to the non-moving party, but conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." Simpson v. AOL Time Warner, Inc., 452 F.3d 1040, 1046 (9th Cir. 2006) (quoting Adams v. Johnson, 355 F.3d 1179, 1183 (9th Cir. 2004)).  There is a strong presumption against dismissing an action for failure to state a claim. See Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997) (citation omitted).  The issue is not whether the plaintiff ultimately will prevail, but whether he may offer evidence in support of his claims. Id. (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).  Consequently, the Court may not grant a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Hicks v. Small, 69 F.3d 967, 969 (9th Cir. 1995).

The liberal rules of notice pleading set forth in the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts supporting his claim. See Yamaguchi v. United States Dep't of the Air Force, 109 F.3d 1475, 1481 (9th Cir. 1997) (quoting Conley v. Gibson, 355 U.S. at 47).  All the Rules require is a "short and plain statement" that adequately gives the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. at 1481 (citations and internal quotations

omitted).  A claim is sufficient if it shows that the plaintiff is entitled to any relief which the

court can grant, even if the complaint asserts the wrong legal theory or asks for improper

relief.  See United States v. Howell, 318 F.2d 162, 166 (9th Cir. 1963).

## III.    DISCUSSION

### A.  Unjust Enrichment/Quantum Meruit

Defendants argue that because Plaintiff alleges he was a party to an employment

contract with HRSM, Plaintiff cannot also make a claim under quantum meruit or unjust

enrichment as a matter of law.  Plaintiff contends under Federal Rule of Civil Procedure

8(e) a party may plead in the alternative and therefore Plaintiff may state a claim both for

breach of contract and unjust enrichment or quantum meruit.

Pursuant to Federal Rule of Civil Procedure 8(e)(2):

> A party may set forth two or more statements of a claim or defense
> alternately or hypothetically, either in one count or defense or in
> separate counts or defenses.  When two or more statements are made in
> the alternative and one of them if made independently would be
> sufficient, the pleading is not made insufficient by the insufficiency of
> one or more of the alternative statements.  A party may also state as
> many separate claims or defenses as the party has regardless of
> consistency and whether based on legal, equitable, or maritime
> grounds.

The liberal policy reflected in Rule 8(e)(2) instructs courts not to construe a pleading "as an

admission against another alternative or inconsistent pleading in the same case." McCalden

v. Cal. Library Ass'n, 955 F.2d 1214, 1219 (9th Cir. 1990) (quoting Molsbergen v. United

States, 757 F.2d 1016, 1019 (9th Cir. 1985)).  Thus, although a plaintiff may not recover on

both theories, "a plaintiff may claim these remedies as alternatives, leaving the ultimate

election for the court." E.H. Boly & Son, Inc. v. Schneider, 525 F.2d 20, 23 n.3 (9th Cir.

1975); see also Hubbard Bus. Plaza v. Lincoln Liberty Life Ins. Co., 596 F. Supp. 344, 347

(D. Nev. 1984) (stating a "claimant is entitled to introduce his evidence in support of all his

claims for relief; if he doesn't make an election among them, the trier of fact decides which,

if any, to sustain.").

1    Defendants seek to dismiss Plaintiff's equitable claim for unjust

2   enrichment/quantum meruit because count one of Plaintiff's Amended Complaint alleges

3   the existence of contract.  Under Rule 8(e)(2), however, Plaintiff is entitled to plead in the

4   alternative "as many separate claims or defenses as [Plaintiff] has regardless of consistency

5   and whether based on legal, equitable, or maritime grounds."  Nevada's recognition of the

6   rule disallowing recovery of equitable remedies where a plaintiff has a full and adequate

7   remedy at law has no bearing on a plaintiff's right to plead in the alternative and to present

8   evidence in support of all his well-pleaded claims for relief.  At this stage of the litigation,

9   the issue is not whether Plaintiff will prevail on his claim, but whether he may conduct

10  discovery and offer evidence in support of his claim.  Alleging a valid employment contract

11  exists does not prove its existence.  Consequently, if the Court were to conclude no valid

12  employment contract existed, Plaintiff would have available an alternative theory for relief.

13   The Court therefore will deny Defendants' motion to dismiss Plaintiff's unjust

14  enrichment/quantum meruit claim because the Federal Rules of Civil Procedure permit

15  Plaintiff to plead a claim for breach of contract and unjust enrichment/quantum meruit,

16  notwithstanding their inconsistency.

17           **B.  Intentional Interference & Conspiracy to Interfere with a Contract**

18           Defendants argue this Court should dismiss Plaintiff's claims for intentional

19  interference with a contract and conspiracy to interfere with a contract because Plaintiff

20  failed to allege Morton, Hard Rock, HRCI, and PM Realty engaged in any acts of

21  interference and, even if Plaintiff had made such allegations, Plaintiff's claim still fails

22  because Defendants cannot interfere with Plaintiff and HRSM's contract as a matter of law.

23  In response, Plaintiff contends Defendants Hard Rock, HRCI, and PM Realty are

24  vicariously liable for Morton's intentional acts of interference.  Plaintiff also argues because

25  these Defendants were not a party to Plaintiff and HRSM's contract, they may be held liable

26  for interfering with the contract.

1     1.  Vicarious Liability

2          Under Nevada law, a corporation may be vicariously liable for an officer,

3     manager, or agent's intentional torts committed within the scope of their employment.

4     Frantz v. Johnson, 999 P.2d 351, 360 n.8 (Nev. 2000); Semenza v. Caughlin Crafted

5     Homes, 901 P.2d 684, 689 (Nev. 1995).

6          Taking the allegations in Plaintiff's Amended Complaint as true and construing

7     them in a light most favorable to Plaintiff, the Court cannot conclude beyond doubt that

8     Plaintiff can prove no set of facts in support of his theory that Hard Rock, HRCI, and PM

9     Realty are vicariously liable for Morton's acts.  The Amended Complaint alleges Morton

10    owns Hard Rock, manages PM Realty, and that PM Realty is a manager of HRCI.

11    Consequently, Morton could act on these entities' behalf.  Although Plaintiff does not

12    expressly allege Morton acted within the scope of Hard Rock, HRCI, or PM Realty's

13    employment when he allegedly interfered with Plaintiff and HRSM's contract, given the

14    notice pleading standard and the nature of Plaintiff's allegations the Amended Complaint is

15    sufficient to withstand Defendants' motion to dismiss on this issue.

16     2.  Conspiracy to Interfere & Intentional Interference with a Contract

17          To state a claim for intentional interference with contractual relations a plaintiff

18    must allege: "(1) a valid and existing contract; (2) the defendant's knowledge of the

19    contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4)

20    actual disruption of the contract; and (5) resulting damage."  Hilton Hotels Corp. v. Butch

21    Lewis Prods., Inc., 862 P.2d 1207, 1210 (Nev. 1993).  To state a claim for conspiracy to

22    interfere with contractual relations the Plaintiff must allege "a combination of two or more

23    persons who, by some concerted action, intend to accomplish an unlawful objective for the

24    purpose of harming another, and damage results from the act or acts."  Hilton Hotels, 862

25    P.2d at 1210.  In Nevada, however, a party cannot, as a matter of law, tortiously interfere

26    with its own contract.  See Bartsas Realty, Inc. v. Nash, 402 P.2d 650, 651 (Nev. 1965).

While Nevada courts have yet to address whether an agent of a principal, acting within the scope of his employment, is considered a third party as a matter of law, this Court has previously held that agents acting within the scope of their employment, i.e. the principal's interest, do not constitute intervening third parties, and therefore cannot tortiously interfere with a contract to which the principal is a party.  See Alam v. Reno Hilton Corp., 819 F. Supp. 905, 911-12 (D. Nev. 1993) (citing Haigh v. Matsushita Elec. Corp. of Am., 676 F. Supp. 1332, 1349 (E.D. Va. 1987)).

Taking the allegations in Plaintiff's Amended Complaint as true and construing them in a light most favorable to Plaintiff, the Court cannot conclude beyond doubt that Plaintiff can prove no set of facts in support of his intentional interference with contractual relations claim.  Plaintiff alleges he had a valid and existing employment contract with HRSM and Defendants knew about the contract.  In addition, Plaintiff alleges Defendants intentionally interfered with Plaintiff and HRSM's contract when Morton acquired control of HRCI and terminated the marketing agreements between HRCI and HRSM, which terminated Plaintiff's contract with HRSM.  As a result, Plaintiff alleges Defendants' conduct actually disrupted and interfered with Plaintiff's contract and damaged Plaintiff.

Defendants' argument that they cannot interfere with Plaintiff and HRSM's contract as a matter of law because Defendants have a financial interest in the contract is unpersuasive.  Nevada law provides only that a party to a contract cannot tortiously interfere with its own contract.  Nevada has never extended the doctrine to cover non-parties who have a financial interest in a third party's contract.  Accordingly, because Defendants were not parties to Plaintiff and HRSM's contract, they may be held liable for intentional interference with the contract.  The Court therefore will deny Defendants' motion to dismiss with respect to Plaintiff's intentional interference with a contract claim.

Defendants' sole argument concerning Plaintiff's conspiracy claim is that because Plaintiff failed to state a claim for intentional interference with a contract he cannot

state a claim for conspiracy to interfere with a contract.  Specifically, Defendants argue that because they could not have interfered with Plaintiff and HRSM's contract as a matter of law, they could not have engaged in an underlying unlawful objective to support a conspiracy claim.  However, because the Court concludes Plaintiff adequately stated a claim for intentional interference with a contract, Defendants' argument fails.  Therefore, the Court will deny Defendants' motion to dismiss Plaintiff's conspiracy to interfere with a contract claim.

### C. Fraud

Defendants contend this Court should dismiss Plaintiff's fraud claim because Plaintiff failed to allege fraud with particularity and because Plaintiff failed to allege Hard Rock, HRCI, and PM Realty engaged in any fraudulent activity.  In response, Plaintiff argues his allegations are sufficiently detailed to satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements and that Hard Rock, HRCI, and PM Realty are vicariously liable for Defendant Morton and Defendant Milam's false statements.

### 1.  Vicarious Liability

Hard Rock, HRCI, and PM Realty may be vicariously liable for Morton and Milam's allegedly fraudulent statements if Morton and Milam acted within the scope of their employment for these entities at the time they made their allegedly fraudulent statements.  Plaintiff, however, did not make such an allegation.  Given the heightened pleading standards under Rule 9(b) and the fact that Plaintiff's fraud claim against Hard Rock, HRCI, and PM Realty hinges on vicarious liability, the Court will dismiss Plaintiff's fraud claim against Hard Rock, HRCI, and PM Realty with leave to amend to allege Morton and Milam acted within the scope of their employment at the time they made their allegedly fraudulent statements.

///

///

15

1

          2. Fed. R. Civ. P. 9(b)

2         Federal Rule of Civil Procedure 9(b) requires a Plaintiff alleging fraud to state

3 with particularity the circumstances constituting fraud in the complaint.  Fed. R. Civ. P.

4 9(b).  To satisfy this burden, the complaint "'must set forth more than the neutral facts

5 necessary to identify the transaction.'"  Yourish v. Cal. Amplifier, 191 F.3d 983, 993 (9th

6 Cir. 1999) (footnote omitted) (quoting In re GlenFed Sec. Litig., 42 F.3d 1541, 1548 (9th

7 Cir. 1994) (en banc)).  The Ninth Circuit has defined "neutral facts" to mean the "'time,

8 place, and content of an alleged misrepresentation.'"  Id. at 993 n.10 (quoting GlenFed, 42

9 F.3d at 1547-48).  In addition to the neutral facts, a plaintiff also must explain what is false

10 about a statement and why it is false.  Moore v. Kayport Package Express, Inc., 885 F.2d

11 531, 540 (9th Cir. 1989).  "[M]ere conclusory allegations of fraud are insufficient."  Id.

12 However, courts must not "make Rule 9(b) carry more weight than it was meant to bear."

13 GlenFed, 42 F.3d at 1554.  So long as the complaint sufficiently describes the

14 circumstances of the alleged fraud so that the defendant is able adequately to respond, the

15 complaint meets the particularity requirement of Rule 9(b).  Cooper v. Pickett, 137 F.3d

16 616, 627 (9th Cir. 1997).

17          a.  Morton's Statements

18         The Amended Complaint alleges Morton made two fraudulent statements.[1]  First,

19 Plaintiff alleges Morton announced that the Project was "sold out" when in actuality the

20 Project was not sold out.  Plaintiff alleges that despite Morton's announcement Metzger,

21 Ackerley, and Milam later "informed the Plaintiff that they had not completed over 3600

22 reservations for the Project.  Thus . . . the Project actually was not sold out."  (Am. Comp.

23

24

     [1]  To the extent Plaintiff seeks to attribute additional fraudulent statements to Morton, he must

25 do so with increased particularity.  Plaintiff's allegations that "Defendants" made certain false representations does not satisfy Rule 9(b)'s particularity requirement and the Court will not attribute

26 such representations to Morton.

at 6.)  Although Plaintiff alleges sufficient particularity with respect to Morton's statement, Plaintiff fails to state a claim for fraud because he does not allege facts supporting justifiable reliance on Morton's statement to his detriment.  Plaintiff alleges after Morton made the announcement Metzger, Ackerley, and Milam told Plaintiff it was not true and Plaintiff therefore continued his efforts to procure additional buyers and to assist such buyers in completing their contracts.  If Plaintiff had relied on Morton's announcement, he would not have procured additional buyers because, according to Morton, no more units were available.  Plaintiff's argument that he relied on Morton's announcement not by procuring additional buyers but "by helping buyers complete existing buyer contracts," is unpersuasive.  (Pl.'s Opp'n to Defs.' Mot. to Dismiss [Doc. #45] at 11-12.)  Plaintiff was already contractually obligated to assist buyers in completing their contracts.  However, even if Plaintiff relied on Morton's statement, such reliance was not reasonable because Metzger, Ackerley, and Milam told Plaintiff that the Project was not sold out. Consequently, the Court will dismiss this claim for fraud with leave to amend to allege justifiable reliance.

   Morton's second allegedly fraudulent statement occurred on October 12, 2005, when Morton "announced the signing of a loan commitment of One Billion Two Hundred and Fifty Million Dollars ($1,250,000,000) for construction of the Project, with Credit Suisse providing the financing." (Am. Comp. at 11.)  Plaintiff's fraud allegation regarding this statement fails Rule 9(b)'s particularity requirement because Plaintiff does not allege what is false about the statement and why it is false.  The Court therefore will dismiss this claim for fraud with leave to amend to state what was false about Morton's statement and why it was false.

### b.  Milam's Statements

   Plaintiff argues Hard Rock, HRCI and PM Realty are vicariously liable for Milam's allegedly fraudulent statements.  Plaintiff alleges Milam manages IDM 1 and IDM

2, which along with PM Realty manage HRCI.  Accordingly, Plaintiff alleges Milam's statements are attributable to IDM 1, IDM 2, and HRCI.  Further, Plaintiff alleges PM Realty is vicariously liable for Milam's statements because PM Realty was a co-principal of HRCI.  In support of his argument, Plaintiff cites Restatement (Third) of Agency § 3.16, which states: "[t]wo or more persons may as coprincipals appoint an agent to act for them in the same transaction or matter."

Hard Rock and PM Realty are not vicariously liable for Milam's statements because Milam is not an officer, manager, or owner of those entities and Plaintiff has not alleged PM Realty, IDM 1, and IDM 2 appointed Milam to be their agent in those Project transactions of which Plaintiff complains.  However, Plaintiff otherwise satisfies the particularity requirement with respect to at least one of Milam's allegedly fraudulent statements.  In paragraph 28 of the Amended Complaint Plaintiff alleges:

> In mid-March 2005, Defendants Eric Metzger, Chad Ackerley, and Christopher Milam introduced Ray Ware as the Designated Broker for HRSM and HRCI.  In addition, Defendants stated that no outside brokers were being offered reservations for their clients; rather, Ray Ware would work with outside brokers and would only receive information regarding potential clients who would then be passed onto the sales people such as Plaintiff.

(Am. Compl. at 5.)  In paragraph 46 of the Amended Complaint, Plaintiff alleges that Metzger, Ackerley, and Milam's statement was false because he discovered Ware was allegedly offering outside brokers reservations and selection of Project units for clients despite Metzger, Ackerley, and Milam's representations to the contrary.  Thus, to the extent Plaintiff amends the Amended Complaint to allege Milam acted within the scope of his employment for HRCI at the time he made the allegedly fraudulent statement, HRCI may be held vicariously liable for Milam's statement.

## D. Unfair & Deceptive Trade Practices

Defendants argue Plaintiff's claim for unfair and deceptive trade practices fails because no private cause of action exists under Chapter 598 of the Nevada Revised Statutes.

18

Defendants also contend even if a private cause of action exists under the statute, Plaintiff's claim fails because he has not alleged any violations with particularity.  In response, Plaintiff argues that while Chapter 598 generally provides for a public cause of action for deceptive trade practices, Nevada Revised Statute § 41.600 provides for a private cause of action by persons who are victims of consumer fraud, which, according to the statute, includes those deceptive trade practices defined in Nevada Revised Statutes § 598.0915 to § 598.0925.  Plaintiff also maintains his Amended Complaint satisfies Rule 9(b)'s particularity requirement.

Nevada Revised Statute Chapter 598 "generally provides for a public cause of action for deceptive trade practices." Nev. Power Co. v. Eighth Judicial Dist. Court of Nev., 102 P.3d 578, 583 n.7 (Nev. 2004).  However, Nevada Revised Statute § 41.600 provides that a victim of "consumer fraud" may assert a private cause of action. Id. Consumer fraud includes "[a] deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive." Id. (quoting Nev. Rev. Stat. § 41.600(2)(d)).

Under Ninth Circuit law, "where fraud is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b).  Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1104-05 (9th Cir. 2003).  Where, however, a plaintiff alleges a unified course of fraudulent conduct and relies entirely on such conduct as the basis of a claim, the claim is considered to be "grounded in fraud" and must satisfy Rule 9(b)'s particularity requirement. Id. at 1103-04.  Thus, although termed "consumer fraud," the Court will apply Rule 9(b) only to those deceptive trade practices claims that actually are grounded in fraud.

///

///

///

19

Plaintiff alleges Defendants engaged in four types of deceptive trade practices by: (1) making false representations[2]; (2) conducting business without all required state, county, or city licenses[3]; (3) failing to disclose material facts in connection with the sale of Project units[4]; and (4) violating state or federal statutes or regulations regarding the sale of Project units.[5]  Because Plaintiff's deceptive trade practices allegations fall under the definition of "consumer fraud," Plaintiff may assert a private cause of action notwithstanding the fact Plaintiff originally brought his claim under Chapter 598 instead of Nevada Revised Statute § 41.600.

_____Plaintiff's first deceptive trade practices claim alleges Morton, Hard Rock, HRCI, and PM Realty knowingly made false representations in a transaction.  This claim is grounded in fraud because Plaintiff relies on the same fraudulent statements here as he did for his fraud claim.  Plaintiff therefore must satisfy Rule 9(b)'s particularity requirement.  While Plaintiff has pleaded some of Morton and Milam's statements with sufficient detail to allow Defendants an opportunity to adequately respond, Plaintiff's claim fails as to Hard Rock, HRCI and PM Realty because Plaintiff's claim against these entities is based on a theory of vicarious liability and Plaintiff did not allege Morton and Milam made false representations while acting within the scope of their employment, which the heightened pleading standard requires.  The Court therefore will dismiss Plaintiff's first claim of deceptive trade practices without prejudice.  However, as discussed above, Plaintiff has stated a claim with adequate particularity against Morton with respect to Morton's statement that the Project was sold out.

---

[2]  Nev. Rev. Stat. § 598.0915.15.

[3]  Nev. Rev. Stat. § 598.0923.1.

[4]  Nev. Rev. Stat. § 598.0923.2.

[5]  Nev. Rev. Stat. § 598.0923.3.

The Court will dismiss Plaintiff's second deceptive trade practices claim because Plaintiff did not allege any facts supporting a claim that Morton, Hard Rock, HRCI, or PM Realty conducted business without all required licenses.  Plaintiff's only mention of licensing appears in paragraph 38 where he alleges:

> In mid-May 2005, Defendant Eric Metzger informed the Plaintiff that he and Defendant Chad Ackerley were studying for the Real Estate Sales Persons licensing exam since they were dealing with clients on a day-to-day basis.  Defendant Chad Ackerley later told the Plaintiff that he did not intend to take the exam in order to obtain his license.

(Am. Comp. at 7.)  This allegation, however, pertains to Metzger and Ackerley, not Morton, Hard Rock, HRCI, or PM Realty.  Nowhere in the Amended Complaint does Plaintiff allege these Defendants conducted business without the required licensing.  Consequently, the Court will dismiss Plaintiff's second deceptive trade practices claim.

Plaintiff's third claim deceptive trade practices claim alleges Morton, Hard Rock, HRCI, and PM Realty failed to disclose material facts in connection with the sale of Project units.  The Court will dismiss this claim because the Amended Complaint does not allege Morton, Hard Rock, PM Realty, or HRCI engaged in the sale of Project units.  In fact, paragraph 22 of the Amended Complaint alleges HRCI contracted with IDM Nevada to grant IDM Nevada the exclusive right to market and sell the Project's units.  In paragraph 23, Plaintiff alleges IDM Nevada assigned its interest in the Sales and Marketing Agreement to HRSM, whose officers are Metzger, Ackerley, and Milam.  Thus, according to the Amended Complaint, HRSM, not Morton, Hard Rock, HRCI, or PM Realty had the exclusive right to market and sell Project units.  The Court therefore will dismiss Plaintiff's third deceptive trade practices claim.

Plaintiff's fourth claim of deceptive trade practices alleges Defendants violated a state or federal statute or regulation relating to the sale of Project units.  Plaintiff's only mention of a state law violation relating to the sale of Project units appears in paragraph 47 of the Amended Complaint where Plaintiff states "[b]ecause Defendant Chad Ackerley

21

continued to store the checks in an unlocked desk drawer, these checks were never turned over to Nevada Title in the timeframe required under Nevada real estate laws." (Am. Compl. at 8.)  This allegation, however, pertains to Ackerley, not Morton, Hard Rock, HRCI, or PM Realty.  Because Plaintiff has not alleged any facts supporting a claim that Morton, Hard Rock, HRCI, and PM Realty violated federal or state laws relating to the sale of Project units or that these Defendants may be vicariously liable for Ackerley's alleged violation, the Court will dismiss without prejudice Plaintiff's fourth deceptive trade practices claim.

**E.  Piercing the Corporate Veil & Punitive Damages**

Defendants contend this Court should dismiss Plaintiff's claims to "pierce the corporate veil" and for punitive damages because they are remedies and do not constitute independent causes of action.  In response, Plaintiff states "[c]learly, Plaintiff is pleading both corporate veil and punitive damages as claims for relief, and not as causes of action." (Pl.'s Opp'n to Def.'s Mot. to Dismiss at 18.)

The Court will not dismiss Plaintiff's request to pierce the corporate veil or for punitive damages because, as both parties recognize, these claims are not independent causes of action, but rather, are remedies and therefore there is nothing for the Court to dismiss at this stage in the proceedings.  Therefore, the Court will deny Defendants' motion to dismiss Plaintiff's claim to pierce the corporate veil and for punitive damages.

\\\

\\\

**IV.       CONCLUSION**

IT IS THEREFORE ORDERED that Defendants Peter A. Morton, Hard Rock Hotel, Inc., HR Condominium Investors (Vegas), LLC and PM Realty, LLC's Motion to Dismiss (Doc. #39) is hereby GRANTED in part and DENIED in part.  The motion is granted without prejudice with respect to Plaintiff's fraud claim as to Defendants Peter A. Morton, Hard Rock Hotel, Inc., HR Condominium Investors (Vegas), LLC and PM Realty, LLC.  The motion also is GRANTED without prejudice with respect to Plaintiff's deceptive trade practices claims against Defendants Peter A. Morton, Hard Rock Hotel, Inc., HR Condominium Investors (Vegas), LLC and PM Realty, LLC, except as to Defendant Morton on Plaintiff's first deceptive trade practices claim.  The motion is DENIED in all other respects.

DATED:   March 1, 2007

_____
PHILIP M. PRO
United States District Judge