UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

PATRICK GEORGE,

        Plaintiff,

v.

PETER A. MORTON, et al.,

        Defendants.

2:06-CV-1112-PMP-GWF

O R D E R

Presently before the Court is Defendants Peter Morton, Hard Rock Hotel, Inc., HR Condominium Investors (Vegas), LLC, PM Realty, LLC, and Hard Rock Holdings, LLC's Motion to Dismiss (Doc. #81), filed on August 3, 2007. On August 23, 2007, Plaintiff Patrick George filed an Opposition and Cross-Motion for Leave to Amend (Doc. #86) to Defendants' Motion to Dismiss. Defendants filed a Reply (Doc. #87) on September 7, 2007. The Court held a hearing on the motion on December 14, 2007. (Mins. of Proceedings [Doc. #100].)

## I.      BACKGROUND

In 2004, Defendant Peter A. Morton ("Morton"), owner of Defendant Hard Rock Hotel, Inc. ("Hard Rock"), announced an expansion project called the "Bungalow Flats Residences at the Hard Rock Hotel & Casino," which would feature approximately 1,350 condominiums, along with various other resort facilities and amenities ("the Project"). (Second Am. Comp. [Doc. #3, "SAC"] at 3.) Defendant PM Realty, LLC ("PM Realty"), which Morton manages, acquired the property on which the Project was to be built. (Id.)

According to the  Second Amended Complaint ("SAC"), Defendant HR Condominium Investors (Vegas), LLC ("HRCI") was to own the Project.  (Id.)  HRCI's managers are PM Realty; Defendant IDM Investments 1, LP ("IDM 1"); and Defendant IDM Investments 2, LP ("IDM 2").  (Id. at 3-4.)  Defendant Christopher Milam ("Milam") manages IDM 1 and IDM 2.  (Id. at 4.)

In February 2005, HRCI entered into an agreement with PM Realty to acquire the Project property for approximately $86,000,000.  (Id.)  HRCI also contracted with Defendant IDM Properties, LP ("IDM Properties"), which Milam manages, to be a consultant for the Project.  (Id. at 4.)  At approximately the same time, HRCI contracted with IDM Properties (Nevada), LLC ("IDM Nevada"), granting IDM Nevada the exclusive right to market and sell the Project's condominiums ("Sales and Marketing Agreement").  (Id.)  Milam also manages IDM Nevada.  (Id.)  IDM Nevada subsequently assigned its interest in the Sales and Marketing Agreement to Defendant HRSM.  (Id.)  Defendants Eric Metzger ("Metzger"), Chad Ackerley ("Ackerley"), and Milam are HRSM's officers.

According to the SAC, in February 2005, Plaintiff entered into a commission contract with HRSM to be a salesperson for the Project.  (Id. at 5.)  Plaintiff alleges the terms of the contract were as follows:

A.  Plaintiff would be employed as a salesperson for HRSM from March 1, 2005 through October 1, 2005, with six-month renewable option periods upon which both parties had to mutually agree.  (Id.)

B.  HRSM would pay Plaintiff 40% of his commissions upon 60% of the units being under contract and Plaintiff would receive the remaining 60% when the contracts went into closing.  (Id.)

C.  Plaintiff would receive a $4,000 per month draw against future commissions until Plaintiff received his first commissions out of the construction loan.  (Id.)

///

D.  Plaintiff's commission for "condotel" and luxury residences would be approximately 0.5% for 1-35 units sold; 0.75% for 36-70 units sold; 1.0% for 71-105 units sold; and 1.25% for 106-140 units sold.  (Id.)

E.  HRSM would pay bungalow commissions out of a pool, with Plaintiff's percentage of the pool being based upon Plaintiff's percentage of contribution to the condotel and luxury units sold.  (Id.)

F.  The bungalows' commission scale would be reduced according to a specified schedule if the total number of condotel and luxury units sold was less than 106.  (Id.)

G.  HRSM agreed to pay for one round trip per month between Las Vegas and New York.  (Id.)

H.  HRSM agreed to reimburse Plaintiff for all reasonable sales related expenses.  (Id.)

I.  Each sales person only would be permitted to take reservations from clients without brokers and HRSM salespersons would not engage in internal competition sales.  (Id. at 6.)

J.  Plaintiff would receive a 1.25% commission override on all properties Duke Real Estate Group sold.  (Id.)

In March 2005, HRSM started marketing and selling the Project.  (Id.) Defendants made numerous representations to Plaintiff promoting the quality and value of the Project.  (Id.)  On multiple occasions, Plaintiff asked Metzger and Ackerley about the Project's specifics, including the size of the units, the total number of units, and pricing information.  (Id.)  Defendants allegedly informed Plaintiff no unit-specific paperwork existed regarding the Project and Plaintiff had to promote the Project's "magic and mystery" to potential buyers.  (Id.)

In mid-March 2005, Ackerley, Metzger, and Milam introduced Ray Ware ("Ware") as HRSM and HRCI's designated broker and stated they were not offering outside

3

brokers reservations for their clients.  (Id.)  Instead, Ware would work with outside brokers and would refer those brokers' potential clients to Plaintiff and HRSM's other sales people. (Id.)   Around this same time, Metzger announced that Duke Realty Group would be the only broker permitted to make Project sales and Plaintiff would receive a 1.25% commission override on such sales as a bonus.  (Id.)  At the end of March 2005, Plaintiff asked Metzger and Ackerley for a complete list of clients to determine the number of reservations that had been taken up to that date and whether the buyers' reservation deposit had been transferred to Nevada Title.  (Id. at 7.)  Metzger and Ackerly allegedly told Plaintiff they were unable to give him a list containing this information.  (Id.)

In April 2005, Plaintiff again asked Metzger and Ackerley for unit-specific information as well as a complete reservation list and information regarding whether the buyers' deposits had been transferred to Nevada Title.  (Id.)  Metzger and Ackerley once again told Plaintiff no unit-specific paper work existed and they were unable to provide a complete reservation list or information concerning buyers' deposits at Nevada Title.  (Id.) Plaintiff also alleges that in April 2005, Metzger and Ackerley encouraged Ware to take broker client reservations and encouraged Plaintiff and other sales people to give all broker client reservations to Ware.  (Id.)  On April 30, 2005, the weekend of the Hard Rock's 10th anniversary event, Morton announced the Project was "sold out."  (Id.)  Plaintiff thereafter ceased procuring buyers for the Project based on Morton's statement that the Project was sold out.  (Id.)  However, after the announcement, Metzger, Ackerley, and Milam informed Plaintiff they had not completed over 3,600 reservations yet, which meant the Project actually was not sold out.  (Id. at 8.)

During a sales meeting on May 3, 2005, Metzger and Ackerley informed Plaintiff that the Project's units would be priced by June 15, 2005 and Plaintiff would receive pricing information before June 1, 2005.  (Id.)  In mid-May 2005, Plaintiff's sales assistant found over forty checks from potential buyers for reservation deposits inside an unlocked desk

4

drawer in the sales office. (Id.) According to the SAC, Ackerley was supposed to deposit the checks but continued to store them in the desk drawer. (Id.) Throughout May 2005, Plaintiff continued to request a reservation list and Nevada Title deposit information but was never provided the information. (Id.)

On June 1, 2005, Metzger and Ackerley gave Plaintiff a reservation list containing client information and whether a client's deposit check was transferred to Nevada Title. (Id. at 8-9.) Upon examination of the list, Plaintiff discovered that numerous reservation deposits were "lost" during transfer and thus never were deposited. (Id. at 9.) On June 4, 2005, Metzger, Ackerley, and Milam held a sales meeting to discuss the units, pricing, and amenities but upon Plaintiff's request for more specific information, Defendants repeatedly stated "I don't know," "I can't tell you that," or "we'll get back to you on that." (Id.)

During June 2005, Metzger and Ackerley informed Plaintiff that the Project broker was not Ware, but instead Mike Gonyea, whom Plaintiff had never heard of or seen, and which change delayed Plaintiff's submission for his real estate license and contributed to the confusion with respect to who the broker was for HRSM. (Id.) Around that same time, the sales team put together Unit Specific Packages ("USPs") to send to buyers. (Id.) The USPs were supposed to consist of an agreement, pricing guides, and floor plans but numerous USPs were missing various pages, many buyers never received their USPs, and a legal department never reviewed the USPs' accuracy. (Id.) In addition, a number of buyers contacted Plaintiff inquiring as to whether their deposit checks had been transferred to Nevada Title because they had never received a confirmation. (Id. at 9-10.) Plaintiff allegedly discovered that his clients' reservation deposit checks were never transferred because Ackerley continued to keep the checks in an unlocked desk drawer at the sales office. (Id.) As a result, these checks were not transferred to Nevada Title in the time-frame required under Nevada law. (Id. at 10.)

In July 2005, Plaintiff found out that Ware was offering outside brokers unit reservations for clients, despite Metzger and Ackerley's representations to the contrary. (Id. at 9.) At the end of July 2005, Metzger, Ackerley, and Milam repeatedly represented to Plaintiff that the Project was on track and wanted Plaintiff to tell potential buyers the Project was sold out and for Plaintiff to highlight the importance of "getting in" the Project. (Id. at 10.) Based on Defendants' representations, Plaintiff continued to market and sell Project units. (Id.) During this same time, Plaintiff asked Metzger and Ackerley on multiple occasions for an updated client reservation list to determine whether Nevada Title had ever received the "lost" deposit checks. (Id.) Although Metzger and Ackerley told Plaintiff that all checks arrived at Nevada Title, a Nevada Title representative allegedly informed Plaintiff that one check had been cut, which was to be sent to Chicago Title, but the representative was unable to determine where the money was, who had possession of it, and whose checks actually were deposited. (Id.)

In August 2005, after Plaintiff received a list of which buyers were going to be placed in Towers 1, 2, and 3, Plaintiff asked Metzger, Ackerley, and Milam why Towers 4 and 5 were not listed and was told that Morton was looking to redesign the tops of these towers to fit more units. (Id.) However, when Plaintiff asked one of the architects for the Project whether Morton was redesigning Towers 4 and 5 the architect allegedly told Plaintiff that was not the case. (Id.) Throughout August 2005, Metzger, Ackerley, and Milam continued to reassure Plaintiff the Project was on track and represented that no Project had ever been in such demand and that this Project was the largest single residential release in North American history. (Id. at 10-11.) Based on these representations, Plaintiff continued to market and sell Project units. (Id. at 11.)

During August 2005, buyers were being placed in different units than they had previously requested. (Id.) HRSM represented that if the buyers wanted to get into the Project they would have to take what was available and continuously stated that the units

were "oversubscribed" and that Plaintiff and other sales persons needed to "spin" the situation by telling buyers they needed to be "flexible" due to unprecedented demand for the Project. (Id.)

In September 2005, Metzger told Plaintiff buyers' contracts would be finished by November because demolition was scheduled for mid-November. (Id.) Metzger also told Plaintiff this date was definite because they were required to obtain the construction loan by then to meet Credit Suisse Boston's requirements to fund the loan. (Id.)

That same month, Metzger, Ackerley, and Milam announced that the tops of Towers 4 and 5 were going to be redesigned with fully furnished "Sky Studios" to accommodate the demand and that the Sky Studios were going to be the "hottest thing." (Id.) Based on these representations, Plaintiff continued to market and sell these new units. (Id.) Metzger, Ackerley, and Milam continued to pressure Plaintiff to "get people into the Project" and to convince those not in units to buy a Sky Studio. (Id. at 12.) However, these Defendants told Plaintiff they were unable to give Plaintiff any information regarding the Sky Studios but to emphasize to potential buyers the "just getting in factor." (Id.) Metzger, Ackerley, and Milam continued to represent to Plaintiff that the Project was progressing as scheduled and assured Plaintiff, and buyers, that they had "secured the largest single phase construction loan in North American history for 1.25 billion by Credit Suisse First Boston." (Id.)

Later in the month, Metzger, Ackerley, and Milam told Plaintiff that construction would be delayed until December 2005, but assured Plaintiff "everything was going forward." (Id.) Based on these representations, Plaintiff continued to market and sell Project units. (Id.) According to the SAC, at the end of September 2005, Milam told Plaintiff that Morton had switched interior designers three times, was increasing the Project's construction costs, and the profit margin was decreasing rapidly due to Morton's lack of knowledge and "ego-based decisions." (Id.)

On October 12, 2005, after 60% of the Project's units were under contract, Morton announced "the signing of a loan commitment" for $1.25 billion for construction of the Project with Credit Suisse. (Id.) Around this same time, Milam and Metzger informed Plaintiff he was entitled to 40% of his commissions because 60% of the units were under contract. (Id. at 13.)

In mid-October 2005, HRSM sent contracts, signature pages, disclosures, floor plans, and information guides to buyers. (Id.) However, many buyers could not fully execute their contracts because signature pages or disclosure statements were missing. (Id.) When Plaintiff inquired about the incomplete contracts, Metzger, Ackerley, and Milam informed Plaintiff that the developer would execute everything and return it to the buyer, which would serve as the buyer's receipt and confirmation. (Id.) Plaintiff claims this never happened. (Id.) Defendants told Plaintiff to focus his efforts on getting more buyers into the Project instead of completing contracts for current buyers. (Id.)

In November 2005, Metzger, Ackerley, and Milam announced that construction would be delayed until February 2006, but reassured Plaintiff that the Project still was going forward. (Id.) Defendants advised Plaintiff to offer clients a fully refundable 10% deposit, regardless of whether or not such clients had executed a contract. (Id.) According to the SAC, HRSM continued to maintain the Project was "sold out" but actually was holding units under fictitious client names so that representatives from Credit Suisse who visited the sales office would see these units allegedly were filled. (Id.)

On December 10, 2005, Milam informed Plaintiff that Morton had eliminated Milam from the Project because Metzger misrepresented to Morton that Milam "was not soliciting money from clients to fund his portion of responsibility for the development, and was instead using the money to fund other personal projects." (Id. at 14.) After repeated attempts to contact Metzger to find out whether Milam's statements were true, Metzger contacted Plaintiff and told him Milam "was a crook, and was stealing money from

investors." (Id.) Metzger also told Plaintiff that Milam "had facilitated the loan to be released at a 90% absorption rate, even though Metzger had initially told Plaintiff that the actual absorption rate was 60%." (Id.)

In December 2005, Morton acquired control of HRCI, including the marketing and development agreements HRCI had with HRSM, and terminated the marketing agreements. (Id.) With Morton in control of HRCI, HRCI released PM Realty, which Morton also manages, from its obligation to sell the Project property to HRCI. (Id.) On or about February 21, 2006, Morton closed the Project's marketing office, dismissed the sales staff, and announced he was considering offers from potential buyers to sell the Hard Rock Hotel & Casino as well as the Project and therefore placed the Project on hold. (Id.) A short time later, Morton announced he had sold the Hard Rock Hotel & Casino, including the Project, and the Project was cancelled. (Id.)

According to the SAC, Plaintiff relied on Defendants' statements and representations and procured about 265 willing and able buyers for units at the Project. (Id.) Pursuant to his contract with HRSM, Plaintiff claims he is entitled to a 1.25% commission for each unit he sold at the project, a 1.25% commission override on all properties Duke Real Estate Group sold, a commission out of the bungalow pool, a percentage of Ware's internal sales, and a $4,000 per month draw up until the time the first commissions were supposed to be paid out of the construction loan. (Id. at 15.) To date, Plaintiff has been paid a few months of draw and some expenses. (Id.) Consequently, Plaintiff brings suit against Defendants claiming breach of contract, breach of the implied covenant of good faith and fair dealing, quantum meruit/unjust enrichment, intentional interference with a contract, conspiracy to interfere with a contract, intentional and negligent misrepresentation, and unfair and deceptive trade practices. (Id. at 16-21.) Plaintiff also alleges that piercing the corporate veil is appropriate, and he seeks punitive damages. (Id. at 20-22.)

Defendants Morton, Hard Rock, HRCI, and PM Realty previously moved to dismiss Plaintiff's First Amended Complaint. The Court partially granted the motion with leave for Plaintiff to amend. Plaintiff thereafter filed the SAC. Defendants Morton, Hard Rock, HRCI, PM Realty, and Hard Rock Holdings, LLC ("Holdings") again move to dismiss, arguing Plaintiff has failed to cure the deficiencies that were present in the First Amended Complaint.

**II.      LEGAL STANDARD**

In considering a motion to dismiss, "'[a]ll allegations and reasonable inferences are taken as true, and the allegations are construed in the light most favorable to the non-moving party, but conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss.'" Simpson v. AOL Time Warner, Inc., 452 F.3d 1040, 1046 (9th Cir. 2006) (quoting Adams v. Johnson, 355 F.3d 1179, 1183 (9th Cir. 2004)). There is a strong presumption against dismissing an action for failure to state a claim. See Gilligan v. Jamco Dev. Corp., 108 F.3d 246, 249 (9th Cir. 1997) (citation omitted). The issue is not whether the plaintiff ultimately will prevail, but whether he may offer evidence in support of his claims. Id. (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

The liberal rules of notice pleading set forth in the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts supporting his claim. See Yamaguchi v. United States Dep't of the Air Force, 109 F.3d 1475, 1481 (9th Cir. 1997) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). All the Rules require is a "short and plain statement" that adequately gives the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. (citations and internal quotations omitted). A claim is sufficient if it shows that the plaintiff is entitled to any relief which the court can grant, even if the complaint asserts the wrong legal theory or asks for improper relief. See United States v. Howell, 318 F.2d 162, 166 (9th Cir. 1963). However, the alleged facts "must be enough to raise a right to relief above the speculative level." Bell

Atl. Corp. v. Twombly, --- U.S. ----, 127 S. Ct. 1955, 1965 (2007).  Facts must be sufficient to "nudge [the plaintiff's] claims across the line from conceivable to plausible."  Id. at 1974.

However, Federal Rule of Civil Procedure 9(b) requires a plaintiff alleging fraud to state with particularity in the complaint the circumstances constituting fraud.  Fed. R. Civ. P. 9(b).  To satisfy this burden, the complaint "'must set forth more than the neutral facts necessary to identify the transaction.'"  Yourish v. Cal. Amplifier, 191 F.3d 983, 993 (9th Cir. 1999) (footnote omitted) (quoting In re GlenFed Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc)).  The United States Court of Appeals for the Ninth Circuit has defined "neutral facts" to mean the "'time, place, and content of an alleged misrepresentation.'"  Id. at 993 n.10 (quoting GlenFed, 42 F.3d at 1547-48).  In addition to the neutral facts, a plaintiff also must explain what is false about a statement and why it is false.  Id. at 993.  "[M]ere conclusory allegations of fraud are insufficient."  Moore v. Kayport Package Exp., Inc., 885 F.2d 531, 540 (9th Cir. 1989).

III.     DISCUSSION

Defendants contend Plaintiff has failed to cure the deficiencies that led the Court to dismiss certain claims against these Defendants in the First Amended Complaint.  As to intentional and negligent misrepresentation, Defendants argue Plaintiff failed to cure the deficiencies in the First Amended Complaint for statements attributable directly to Morton.  Defendants thus contend neither Morton nor his entities can be liable for intentional or negligent misrepresentation based on statements Morton made.  Defendants also argue HRCI cannot be liable for Milam's alleged misrepresentations because Plaintiff's allegations that Milam made the representations in the scope of his employment for HRCI are conclusory and contrary to other pleaded facts which show Milam was working for IDM Nevada when he allegedly made the statements.  Defendants allege that because IDM Nevada had the exclusive right to market and sell the condo units, any statements Milam

made about marketing and sales was in the scope of his IDM Nevada employment, not HRCI.

Finally, Defendants argue Plaintiff has failed to cure the deficiency in Plaintiff's third deceptive trade practices claim. Defendants note the Court dismissed this claim because Plaintiff did not allege these Defendants engaged in the sale of condo units. Plaintiff amended to allege Defendants failed to disclose material facts in connection with the status of the Project, rather than in connection with the sale of Project units. Defendants argue that because this is a fraud claim, Plaintiff must plead with particularity what alleged material facts each Defendant failed to disclose and Plaintiff has not done so.

Plaintiff responds he adequately has alleged fraud and deceptive practices because he alleged Morton failed to disclose important facts regarding the Project, including that he planned to sell the Hotel and cancel the Project and the construction loan would not fund until the 90% threshold. Additionally, Plaintiff argues Morton is vicariously liable for the representations of others, including Milam, Metzger, and Ackerley based on agency and joint venture theories. Plaintiff contends Hard Rock, PM Realty, and HRCI are liable for their agents' alleged misrepresentations and omissions, and these entities are therefore liable for Morton's failure to disclose. Plaintiff also argues HRCI and PM Realty are liable for Milam, Metzger, and Ackerley's misrepresentations on joint venture and agency theories. Plaintiff argues he adequately pled Milam was acting in the scope of his HRCI employment. Finally, Plaintiff requests leave to amend to add newly discovered facts.

**A. Intentional Misrepresentation (count six)**

1. Morton

The parties' briefing addresses four different bases for holding Morton liable for alleged misrepresentations. First, the SAC includes two affirmative representations Morton himself allegedly made. Second, Plaintiff argues Morton may be liable based on his failure

12

to disclose relevant facts. Third, Plaintiff argues Morton is liable as a joint venturer. Finally, Plaintiff argues Morton is liable for his agents' alleged misrepresentations.

a. Affirmative Representations

In the Court's prior Order, the Court noted that the First Amended Complaint alleged Morton made two affirmative misrepresentations. First, Plaintiff alleged Morton announced that the Project was "sold out" when actually the Project was not sold out. The Court held Plaintiff failed to state a claim on this statement because he did not allege facts supporting justifiable reliance on Morton's statement to his detriment. Plaintiff alleged that after Morton made the announcement, Metzger, Ackerley, and Milam told Plaintiff it was not true and Plaintiff therefore continued his efforts to procure additional buyers and to assist such buyers in completing their contracts. Morton's second allegedly fraudulent statement was when he announced the signing of a $1.25 billion loan commitment with Credit Suisse. The Court previously ruled Plaintiff failed to allege what is false about the statement and why it is false. The Court granted Plaintiff leave to amend.

In the SAC, Plaintiff alleges that for a period of time after Morton claimed the Project was sold out, Plaintiff stopped procuring buyers and notified potential purchasers the project was sold out. (SAC at ¶ 43.) Although the SAC is not entirely clear as to how long a period Plaintiff ceased working in reliance on this statement, a fair reading of the SAC's allegations indicate it could be as little as three days. The SAC does not allege how Plaintiff's alleged reliance on Morton's statement damaged Plaintiff. Plaintiff claims Morton fraudulently induced him into procuring buyers for a project Morton did not intend to construct. If Plaintiff ceased his efforts to procure buyers for a few days, then he was not using his efforts for a doomed project and thus suffered no harm as a result of relying on Morton's allegedly false statement. With respect to the Credit Suisse statement, Plaintiff has not attempted to cure the defects noted in the First Amended Complaint, as Plaintiff has not alleged Morton's statement regarding the loan commitment was false.

13

*///*

Plaintiff does not attempt to support his misrepresentation claims based on Morton's alleged affirmative representations. Instead, Plaintiff relies on the theory that Morton failed to disclose material facts. Although Plaintiff argues he made this claim in the SAC, the SAC refers to affirmative misrepresentations, not failures to disclose. Because the SAC does not cure the deficiencies regarding Morton's alleged affirmative misrepresentations, the Court will grant Defendants' motion with respect to any misrepresentation theory based on Morton's alleged affirmative misrepresentations in the SAC.

### b. Failure to Disclose

Plaintiff moves to amend and offers a Third Amended Complaint ("TAC") which explicitly sets forth the failure to disclose theory. Defendants contend the Court should deny leave to amend because Plaintiff's motion is untimely and futile. Defendants argue amendment is futile because under Nevada law, no liability attaches for failure to disclose unless the plaintiff alleges a special relationship existed which imposes a duty to disclose. Defendants argue no allegations in the TAC support a special relationship between Morton and Plaintiff which would impose on Morton a duty to disclose. Defendants also argue the TAC is not sufficiently particular about what Morton was supposed to disclose to Plaintiff and when he became duty-bound to disclose such information.

Plaintiff responds that because Morton had superior knowledge regarding his plans to sell the Hotel, and because such information was not ascertainable by Plaintiff, Morton had a duty to disclose his plans to Plaintiff. Additionally, Plaintiff argues a question of fact exists regarding whether Morton and Plaintiff had a special relationship imposing a duty to disclose on Morton. Defendants respond that the TAC does not make clear what information Morton was supposed to disclose or when he was supposed to disclose it. For example, Defendants question whether Morton would have a duty to

14

disclose that he merely was considering possibly selling the Hotel or whether such a duty would be triggered only when Morton actually had decided to sell the Hotel. Defendants also argue no special relationship existed between Morton and Plaintiff, as the two did not know each other, did not communicate with one another, and any relationship between them is too attenuated to impose a disclosure duty.

Generally, the Court liberally should allow for amendments to pleadings under Federal Rule of Civil Procedure 15(a). But where the Court has entered a scheduling order, a request to amend the pleadings no longer is governed by Rule 15; rather, Rule 16 controls. Coleman v. Quaker Oats Co., 232 F.3d 1271, 1294 (9th Cir. 2000). Where a party moves to amend the pleadings after a deadline set in the Rule 16 scheduling order, the Court should not modify the scheduling order "except upon a showing of good cause." Fed. R. Civ. P. 16(b). The "good cause" standard "primarily considers the diligence of the party seeking the amendment." Coleman, 232 F.3d at 1294. Additionally, although Rule 16(b) does not require a showing of prejudice, the Court may consider in making its good cause determination whether prejudice would result to the party opposing amendment. Id. at 1295. If the moving party shows good cause for amendment, the Court also may consider whether to permit amendment under the Rule 15 factors, including whether amendment would prejudice the opposing party, is sought in bad faith, is futile, or creates undue delay. Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 607-08 (9th Cir. 1992).

Nevada generally does not recognize an action for fraud based on nondisclosure. See Epperson v. Roloff, 719 P.2d 799, 804 (Nev. 1986) (noting the "general rule" that "an action in deceit will not lie for nondisclosure"). However, a duty to disclose may arise from the parties' relationship. Dow Chem. Co. v. Mahlum, 970 P.2d 98, 110 (Nev. 1998), disagreed with on other grounds by GES, Inc. v. Corbitt, 21 P.3d 11, 15 (Nev. 2001), ("The duty to disclose requires, at a minimum, some form of relationship between the parties."). For example, where the parties are involved in a transaction and "the defendant alone has

15

knowledge of material facts which are not accessible to the plaintiff," the defendant has a duty of disclosure. Id.; see also Nelson v. Heer, 163 P.3d 420, 426 (Nev. 2007) ("The suppression or omission of a material fact which a party is bound in good faith to disclose is equivalent to a false representation, since it constitutes an indirect representation that such fact does not exist." (quotations omitted)). In Epperson, the plaintiffs purchased a home and when it rained a week later, the roof leaked. Epperson, 719 P.2d at 801. The Nevada Supreme Court held the buyers were entitled to present to the jury evidence that the seller "had knowledge of the leakage problem, that the existence of the problem was not apparent to the [buyers] and that [the sellers] therefore had a duty to disclose the problem to them prior to their purchase of the home." Id. at 804.

Additionally, a "special relationship" between the parties may trigger the duty to disclose, even where the plaintiff has access to facts suggesting a problem exists:

> "Nondisclosure will become the equivalent of fraudulent concealment when it becomes the duty of a person to speak in order that the party with whom he is dealing may be placed on an equal footing with him. The duty to speak . . . may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence."[1]

Mackintosh v. Jack Matthews & Co., 855 P.2d 549, 553 (Nev. 1993) (quoting Mancini v. Gorick, 536 N.E.2d 8, 9-10 (Ohio Ct. App. 1987)). See also Nev. Power Co. v. Monsanto

---

[1] In Mackintosh, as in Epperson, the seller failed to inform the buyers of leaks in the home. Id. at 550-51. Unlike the buyers in Epperson, however, the Mackintosh purchasers noticed water stains on the basement walls and a pest inspection report noted dampness in the walls prior to the buyers moving in or purchasing the home. Id. at 553. The Nevada Supreme Court held that because the buyers knew or should have known through reasonable inquiry of the water problem, the sellers were under no duty to disclose under Epperson. Id.
Nevertheless, the Nevada Supreme Court concluded the seller may have been under a duty to disclose based on a "special relationship" between the seller and the buyer. Id. The Mackintosh seller also was financing the buyers' loan to purchase the leaky home. The Mackintosh court held the seller's role as both seller and lender created a fact question as to whether this relationship would have caused a reasonable buyer to place more confidence and reliance in the seller than in an ordinary seller. Id. at 554.

16

Co., 891 F. Supp. 1406, 1416 n.3 (D. Nev. 1995) (citing cases where Nevada has found a "special relationship," such as a real estate agent/vendor-buyer relationship, where the agent has superior knowledge; an insurer-insured relationship; a trustee-beneficiary relationship; and an attorney-client relationship). To prove a special relationship exists, the plaintiff must show a reasonable person under the circumstances would impart special confidence and the trusted party reasonably should have known of that confidence. Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 881 (9th Cir. 2007) (applying Nevada law).

Even if the Court were to conclude Plaintiff demonstrated good faith for his untimely motion to amend, the Court will deny Plaintiff's motion because amendment would be futile. The TAC alleges Morton controlled all aspects of the Project and that he used this control to promote the Project to increase the Hard Rock Hotel's value "knowing that he planned to sell the Hard Rock Hotel & Casino and Project before the Project would ever be constructed." (Opp'n to Defs.' Mot. to Dismiss [Doc. #86, "TAC"], Ex. 3 at 5.) However, the TAC does not allege any special relationship between Morton and Plaintiff imposing on Morton a duty to disclose his plans. Morton's alleged control over the Project does not impose on him a duty to disclose his alleged plan to sell the Hotel to any person connected with working on the Project. The TAC contains no allegations that Morton even knew who Plaintiff was, much less that they shared some relationship or were involved in a transaction with each other. See Dow Chem., 970 P.2d at 111 (holding maker of silicone breast implants had no duty to disclose its superior knowledge of the dangers of silicone in the human body because it was not involved in any transaction and had no relationship with the purchaser of breast implants). Because the TAC fails to state a claim for nondisclosure, the Court will deny Plaintiff's motion to amend.

c. Joint Venture

Under Nevada law, a joint venture is "'a contractual relationship in the nature of an informal partnership wherein two or more persons conduct some business enterprise,

17

agreeing to share jointly, or in proportion to capital contributed, in profits and losses.'" Radaker v. Scott, 855 P.2d 1037, 1040 (Nev. 1993) (quoting Bruttomesso v. Las Vegas Metro. Police Dep't, 591 P.2d 254, 256 (Nev. 1979)). "A joint venture is a less formal relationship than a partnership and is typically an association entered into to perform a more limited business objective for a more brief period of time." Hook v. Giuricich, 823 P.2d 294, 296 (Nev. 1992). To determine whether the parties intended to create a joint venture, the court applies ordinary rules of contract interpretation and considers the parties' actions and conduct. Radaker, 855 P.2d at 1040.

Nevada partnership principles apply to joint ventures. Id. Like a partnership, all members of a joint venture are jointly and severally liable to third persons for wrongful acts, including fraud, committed by one venturer in furtherance of the joint enterprise. Id. at 1041.

The SAC alleges the Project was to be owned by HRCI, which is managed by PM Realty and IDM 1 and 2. (SAC at 3.) The SAC alleges Morton manages PM Realty, and Milam manages IDM 1 and 2. (SAC at 3-4.) The SAC alleges Morton is PM Realty's alter ego, although the SAC merely recites the elements of alter ego without any factual allegations in support. (SAC at 20.)

Taking the SAC's allegations as true, a reasonable jury could find PM Realty and IDM 1 and 2 engaged in a joint venture to form HRCI and construct the Project. See Central Bank, N.A. v. Baldwin, 583 P.2d 1087 (Nev. 1978) (finding bank and building contractor engaged in joint venture by forming company to obtain construction loans and engage in construction projects). However, the SAC does not allege Morton personally was a joint venturer. Rather, it alleges PM Realty formed the joint venture with IDM 1 and 2. Although Plaintiff alleges Morton is PM Realty's alter ego, the SAC contains no factual allegations of alter ego. The SAC therefore fails to allege misrepresentation against Morton on a joint venture theory.

*///*

### d.  Agency

Under Nevada law, an agency relationship is "formed when one who hires another retains a contractual right to control the other's manner of performance." <u>Grand Hotel Gift Shop v. Granite State Ins. Co.</u>, 839 P.2d 599, 602 (Nev. 1992).  The party asserting an agency relationship exists bears the burden of proving agency.  <u>Trump v. Eighth Judicial Dist. Court of State of Nev. In & For County of Clark</u>, 857 P.2d 740, 745 n.3 (Nev. 1993).  Generally, whether an agency exists is a question of fact for the jury.  <u>N. Nev. Mobile Home Brokers v. Penrod</u>, 610 P.2d 724, 726 (Nev. 1980).

The SAC does not allege Morton hired Milam, Metzger, or Ackerley as his personal agents.  Even if Milam, Metzger, or Ackerley were PM Realty's agent, Plaintiff has not alleged facts supporting his conclusory allegation that Morton is PM Realty's alter ego.  The SAC therefore fails to allege misrepresentation against Morton on an agency theory.

The SAC does not cure the defects this Court noted in its prior Order and the Court will deny Plaintiff's motion to amend.  Accordingly, the Court will grant Defendants' motion to dismiss the misrepresentation claim against Defendant Morton.

### 2.  Hard Rock Hotel, Inc. and Hard Rock Hotel Holdings, LLC

Plaintiff argues that because Morton was an officer of the Hard Rock Hotel, Inc., the Hotel is liable for his misrepresentations made within the scope of his employment.  Plaintiff further argues that because Hard Rock Hotel Holdings, LLC is the Hotel's successor in interest, it is liable as well.  Defendants respond that because Morton did not make any misrepresentations, neither Hotel nor Holdings are liable.

Under Nevada law, a corporation may be vicariously liable for an officer, manager, or agent's intentional torts committed within the scope of their employment.

<u>Frantz v. Johnson</u>, 999 P.2d 351, 360 n.8 (Nev. 2000); <u>Semenza v. Caughlin Crafted</u>
<u>Homes</u>, 901 P.2d 684, 689 (Nev. 1995).  Because the SAC does not adequately allege
Morton made any misrepresentations for which he could be liable, Hotel cannot be liable
for Morton's alleged misrepresentations either.  Because Holdings is not liable unless Hotel
is liable, the SAC fails to state a claim against Holdings as well.  Accordingly, the Court
will grant Defendants' motion to dismiss the misrepresentation claim against Defendants
Hard Rock Hotel, Inc. and Hard Rock Holdings, LLC.

### 3.  PM Realty

As stated above, taking the SAC's allegations as true, a reasonable jury could
find PM Realty and IDM 1 and 2 engaged in a joint venture to form HRCI and construct the
Project.  See <u>Central Bank, N.A. v. Baldwin</u>, 583 P.2d 1087 (Nev. 1978) (finding bank and
building contractor engaged in joint venture by forming company to obtain construction
loans and engage in construction projects).  As joint venturers, PM Realty could be liable
for its joint venturer's misrepresentations.  The SAC alleges Milam made
misrepresentations in the scope of his employment for IDM 1 and 2.  Whether Milam was
acting in the scope of his employment for IDM 1 and 2 when he made the alleged
misrepresentations is a question of fact not suitable for resolution on a motion to dismiss.
The Court therefore will deny Defendants' motion to dismiss the misrepresentation claim
against PM Realty.

### 4.  HRCI

Like the other Defendants, Defendant HRCI cannot be liable for Morton's
alleged misrepresentations.  However, HRCI contracted with IDM Properties, granting IDM
Properties the exclusive right to market and sell the condo units.  IDM assigned that right to
HRSM.  Metzger and Ackerley work for HRSM.  Considering these allegations, whether
Metzger and Ackerley were HRCI's agents such that their misrepresentations are
attributable to HRCI is a question of fact not suitable for determination on a motion to

dismiss.

Additionally, Plaintiff has alleged Milam acted in the scope of his employment for HRCI when he allegedly made misrepresentations to Plaintiff. Although Defendants contend this allegation is conclusory, it is not without factual support. The SAC alleges Milam acted as a liaison between HRCI and HRSM. Further, a fair reading of the SAC supports the inference that HRCI and HRSM's interests overlapped when it came to selling condo units. Consequently, it is not clear that any statement Milam made on the subject necessarily fell within his duties with HRSM rather than HRCI. The question of whether Milam was acting in the scope of his employment for HRCI at the time he made the alleged misrepresentations is a question of fact not suitable for determination on a motion for summary judgment. The Court therefore will deny Defendants' motion to dismiss the misrepresentation claim as to Defendant HRCI.

**B. Nevada Deceptive Trade Practices Act (count eight)**

In the Court's prior Order, the Court stated that Plaintiff's third deceptive trade practices claim alleged Morton, Hard Rock Hotel, Inc., HRCI, and PM Realty failed to disclose material facts in connection with the sale of Project units. The Court dismissed this claim because the Amended Complaint did not allege Morton, Hard Rock, PM Realty, or HRCI engaged in the sale of Project units, and, according to the Amended Complaint, HRSM, not Morton, Hard Rock, HRCI, or PM Realty had the exclusive right to market and sell Project units. Defendants contend Plaintiff failed to cure this defect in the SAC. Defendants contend that Plaintiff's claim is a unified course of fraudulent conduct, and the SAC does not advise Defendants with particularity what material facts they failed to disclose. Plaintiff does not respond specifically to this argument, but instead jointly addresses the misrepresentation and deceptive trade practices claims.

In the First Amended Complaint, Plaintiff alleged Defendants engaged in deceptive trade practices "by failing to disclose material facts in connection with the sale of

the units at the Project." (First Am. Compl. at ¶ 122.)  The Court ruled that because none of the Morton Defendants engaged in the sale of units, this did not state a claim against these Defendants.  The Court granted Plaintiff leave to amend.  The SAC alleges Defendants failed "to disclose material facts in connection with the status of the Project."  (SAC at ¶ 133.)

The SAC does not adequately allege what material facts regarding the Project's status Defendants failed to disclose.  The SAC states only in conclusory fashion that Defendants failed to disclose material facts, but the SAC does not identify what material facts Defendants should have disclosed, which Defendants should have disclosed such information, or when Defendants should have disclosed it.  Accordingly, the Court will grant Defendants' motion to dismiss the third deceptive trade practices claim.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Defendants Peter Morton, Hard Rock Hotel, Inc., HR Condominium Investors (Vegas), LLC, PM Realty, LLC, and Hard Rock Holdings, LLC's Motion to Dismiss (Doc. #81) is hereby GRANTED in part and DENIED in part.  The motion is granted as to Defendants Morton, Hard Rock Hotel, Inc., and Hard Rock Holdings, LLC on Plaintiff's misrepresentation claim (count six).  The motion also is granted as to Defendants Morton, Hard Rock Hotel, Inc., Hard Rock Holdings, LLC, PM Realty, and HRCI as to Plaintiff's third deceptive trade practices claim (count eight).

IT IS FURTHER ORDERED that Plaintiff's Cross-Motion for Leave to Amend (Doc. #86) is hereby DENIED.

DATED:  DECEMBER 27, 2007.

_____
PHILIP M. PRO
United States District Judge

22